COMMONWEALTH *vs.* JOSEPH M. GREENBERG & another
(and twenty-one companion cases[1]).

Suffolk.   December 1, 1958. — July 16, 1959.

Present: WILKINS, C.J., RONAN, WILLIAMS, COUNIHAN, &
WHITTEMORE, JJ.

*Larceny. False Pretences. Conspiracy. Trust Company,* Officers and
agents. *Pleading, Criminal,* Plea in abatement, Plea of not guilty,
Indictment, Bill of particulars. *Practice, Criminal,* Abatement;
Waiver; Trial of indictments together; Examination of jurors; Ex-
ceptions: saving of exception; Election between counts; Mistrial;
Requests, rulings and instructions; Charge to jury; Sentence. *Evi-
dence,* Business records, Admissions and confessions, Relevancy and
materiality, On cross-examination, Conspiracy, Refreshment of wit-
ness's recollection, Collation, Competency. *Witness,* Refreshment of
recollection. *Waiver. Jury and Jurors. Statute,* Retroactive statute.

By pleading not guilty to an indictment upon arraignment, the defendant
admitted the validity of the indictment and waived matters in abate-
ment, and, although he subsequently filed a plea in abatement by leave
of court, his insistence thereafter in leaving in effect his plea of not
guilty reaffirmed his waiver of matters in abatement and made it
unnecessary for the court to hear the plea in abatement. [564–565]

A plea in abatement to an indictment was insufficient on its face in that
it contained only general allegations that, while the defendant was a
voluntary witness before the grand jury which returned the indict-
ment, the district attorney practised "acts of guile and intimidation"
on him. [565]

An indictment was not invalidated by the fact that the defendant had
testified voluntarily before the grand jury which returned it. [565]

Particulars filed by the Commonwealth in connection with indictments
for larcenies of money, for obtaining credit from a trust company by
false statements in writing with intent to defraud, for illegal receipt
of gratuities by an officer of a trust company, and for conspiracy,
indicating how the larcenies were effected, the credit obtained, the
character of the gratuities received, and the defendants' respective
participation in the conspiracies adequately advised them of the nature
of the charges against them and sufficed to enable them to prepare
their defences. [565]

---

[1] Of the companion cases eleven are entitled Commonwealth *vs.* Joseph M.
Greenberg & another, and ten are entitled Commonwealth *vs.* Donald K.
Taylor.

No abuse of discretion was shown in denial of a motion by a defendant about to be tried on certain indictments that other pending indictments, to which he was not a party, against an alleged coconspirator of his be tried with the indictments against him. [565–566]

No abuse of discretion appeared in an alleged refusal of the judge at the trial of indictments to examine prospective jurors, beyond the statutory questions, in accordance with questions proposed by the defendant regarding what they had heard or read of the case and their ability to render a fair verdict. [566]

There was no error in denial of a motion by the defendant, presented at the conclusion of the evidence at the trial together of an indictment charging larceny of money from a trust company by a false pretence under G. L. c. 266, § 30, as amended, and an indictment charging obtaining of credit from the trust company by a false statement in writing with intent to defraud under c. 266, § 33 (2), as amended through St. 1945, c. 282, § 3, that the Commonwealth be required to elect between the two indictments. [572–573]

At the trial of indictments against a money lender for obtaining credit from a trust company by a false statement in writing with intent to defraud, for larceny of money by false pretences, and for conspiracy, findings that the defendant was guilty on each charge were warranted by evidence of many transactions in which he and one in the building material business, his coconspirator, carried out a plan whereby the defendant obtained loans from the trust company on his personal notes secured by assignments of notes of his coconspirator and of spurious collateral, supplied by his coconspirator and known by the defendant to be spurious, in the form of city and State purchase and service orders which contained false statements as to their genuineness and upon the validity of which the trust company relied in making the loans. [573–575]

At the trial of an indictment charging a defendant jointly with two others with conspiracy to obtain credit from a trust company by a false statement in writing with intent to defraud, a finding that that defendant, who was assistant treasurer and credit manager of the trust company, was guilty was warranted where it appeared that, about two years after the other two men indicted first carried out a plan between themselves to obtain money from the trust company through loans procured by one with spurious collateral supplied by the other and containing false statements as to its genuineness, the defendant officer, learning of the plan, agreed not to interfere with the use of the "rough stuff" being used as collateral by the other two, assisted one of them in obtaining money from other sources through the use of similar spurious collateral, authorized the trust company to credit his checks as cash, and was paid a weekly sum by him for such non-interference and assistance. [575–576]

At the trial of indictments charging a defendant jointly with two others with larcenies of money from a trust company of which the defendant was assistant treasurer and credit manager and with obtaining credit from the trust company by false statements in writing with intent to

defraud, evidence warranted findings that the defendant officer was guilty on counts of the indictments charging the commission of such offences at and after a time when he first actively participated in a scheme conceived by the other two more than two years before whereby one of them obtained loans from the trust company by the use of spurious collateral supplied by the other and containing false statements as to its genuineness, and did not warrant findings that the defendant officer was guilty on counts of the indictments charging the commission of such offences before that time, although he previously had had reason to believe that the trust company was lending the money on doubtful security. [576]

Evidence at the trial of an indictment for larceny of money from a bank warranted a finding of guilty in that the defendant arranged a loan by the bank to another person with knowledge that the collateral to be furnished was spurious, and that the defendant received a portion of the money obtained. [576–577]

Evidence warranted a finding of guilty against a defendant charged with larceny from a money lender in that the defendant, an officer of a trust company, arranged loans to a borrower by the money lender knowing the collateral therefor to be spurious, handled checks received and authorized his trust company to credit them as cash, provided against investigation of the collateral, and was paid for his services by both the money lender and the borrower. [577]

There was no error in denying a motion for directed verdicts on indictments charging the defendant in conjunction with a borrower from a trust company with larcenies from it and with procuring credit from it by false statements in writing with intent to defraud, where it appeared that the defendant arranged for the credit and the consequent lending of money to the borrower on collateral known by the defendant to be spurious although it was certified in writing by the borrower to the trust company to be genuine. [577]

Evidence of a defendant's talks with a borrower of money and of subsequent transactions promoted by the defendant for him whereby money was lent to the borrower by others in reliance on collateral which he furnished and which was known by the defendant to be spurious warranted finding the defendant guilty on an indictment charging him with conspiring with the borrower to steal money from time to time from persons then unascertained. [577]

An assistant treasurer and credit manager of a trust company might properly be found guilty on indictments charging violations of G. L. c. 172, § 16, on evidence of payments he received for services from one who participated in borrowing money from the trust company on collateral known to the defendant to be spurious, whose checks the defendant arranged to have credited as cash, and for whom he arranged loans from outside sources facilitating reduction of the loans at the trust company and continuance of the borrowing. [577–578]

St. 1954, c. 442, § 1, amending G. L. c. 233, § 78, by extending to criminal proceedings the admissibility in evidence of the records theretofore specified by § 78 as admissible in civil proceedings is procedural and

was applicable at a criminal trial for offences committed prior to its effective date. [578–579]

Admission in evidence of certain business records imported a finding of the facts prerequisite to their admission under G. L. c. 233, § 78, as amended, in the absence of anything negativing such a finding. [579]

There was no error at the trial of indictments in denial of a motion by the defendant for a declaration of a mistrial on the ground that testimony by him before the grand jury was admitted in evidence where it appeared that the testimony related to transactions which were in issue at the trial. [580]

There was no error at the trial together of indictments against two defendants in denial of a motion for a declaration of a mistrial by one defendant on the ground that he was harmed by the admission in evidence of testimony of the other defendant before the grand jury where the trial judge restricted the application of such testimony to the indictments against the other defendant. [580]

At the trial of indictments based on larcenies of money by obtaining loans by means of spurious collateral, lenders were properly allowed to testify that in making the loans they relied on the validity of the collateral and that if they had known it to be spurious they would not have made the loans. [580]

No reversible error was shown on the record of the trial of indictments with respect to the form and relevancy of questions propounded in direct examination by the district attorney, or in exclusion of questions asked by the defendants on cross-examination, or in denial of their motions to strike answers to questions previously admitted. [580–581]

Where a prima facie case had been made out at the trial of an indictment charging two defendants and a third person with conspiring to commit certain crimes, evidence of the acts and declarations of each alleged conspirator in furtherance of the object of the conspiracy was admissible against the others. [581]

The defendant at a criminal trial was not entitled as of right to inspect a writing before it was shown to a witness for the Commonwealth by the district attorney in order to refresh the witness's recollection. [581]

There was no error, at the trial of indictments involving a large number of transactions and a multiplicity of exhibits bearing thereon, in the admission in evidence of charts prepared by an accountant collating the exhibits admitted and of his testimony stating the results of his computations from the admitted evidence. [581–582]

At the trial of indictments against two defendants based on obtaining credit and loans from a trust company by means of spurious collateral supplied by a third person, evidence offered by the defendants of the use of similar spurious collateral by the third person in obtaining loans from other sources and of his use of the proceeds of such loans might properly be excluded as raising extraneous issues. [582–583]

At the trial of indictments against two defendants at which they introduced evidence through their own testimony and that of other witnesses, there was no error in allowing motions by the Commonwealth

after the defendants had rested that the evidence given by each defendant and his witnesses be applied to the other defendant so far as it was applicable.  [583]

There was no error in a brief charge following a protracted trial of numerous indictments relating to many complex transactions where the judge gave adequate instructions as to the law applicable to a criminal trial and pointed out the issues for the jury to determine and stated the substantive law applicable thereto, although he did not attempt to review the evidence.  [583–584]

There was no reversible error in the circumstances in a refusal by the judge to pass upon nearly six hundred requests for rulings presented by counsel for the defendants at the close of the evidence at a protracted trial of numerous indictments relating to many complex transactions where the charge, although brief and containing no review of the evidence, adequately instructed the jury as to the principles of law applicable to a criminal case, properly presented the issues of fact, and stated accurately the pertinent substantive law.  [584–585]

A defendant "convicted of more than three separate and distinct larcenies at one sitting" of the Superior Court as set forth in indictments against him was properly adjudicated to be a common and notorious thief under G. L. c. 266, § 40, and sentenced to the State prison.  [585–586]

TWENTY-TWO INDICTMENTS, found and returned on March 16, 1954, April 9, 1954, May 24, 1954, and December 17, 1954.

Preliminary matters described in the opinion were heard in the Superior Court by *Hudson, J., Murray, J.,* and *Kirk, J.* The cases were tried before *Swift, J.*

*Dwight L. Allison,* (*Theodore S. Bakas* with him,) for the defendant Taylor.

*Michael Carchia & Stephen C. Struffolino,* for the defendant Greenberg.

*John F. McAuliffe,* Assistant District Attorney, (*George F. Hurley, Gerald F. Muldoon, & John P. White* with him,) for the Commonwealth.

WILLIAMS, J.  The defendants have been found guilty by a jury of the offences with which they were charged in the following described indictments.[1]

Five indictments numbered 70, 71, 72, 73, and 74 in which, with one George J. Maitland, they were charged in seventy counts with the larceny of money from Pilgrim

---

[1] The numbers of the indictments are those of 1957.

Trust Company on divers days between January 24, 1950, and February 5, 1954. G. L. c. 266, § 30.

Five indictments numbered 75, 76, 77, 78, and 79 in which, with Maitland, they were charged in seventy counts with obtaining, with intent to defraud by false statements in writing respecting the financial condition and the means and ability to pay of Greenberg and Maitland, credit from Pilgrim Trust Company at the same times as the larcenies charged in indictments numbered 70, 71, 72, 73, and 74. G. L. c. 266, § 33.

Three indictments numbered 104, 106, and 108 in which Taylor with Maitland was charged in thirty-five counts with larceny of money from Shore Finance Corporation on divers days between October 6, 1952, and January 18, 1954. G. L. c. 266, § 30.

An indictment numbered 105 in which Taylor with Maitland was charged in twelve counts with larceny of money from Harvard Trust Company on divers days between January 22, 1953, and December 14, 1953. G. L. c. 266, § 30.

An indictment numbered 107 in which Taylor with Maitland was charged in twelve counts with obtaining, with intent to defraud by false statements in writing respecting the financial condition and the means and ability to pay of Maitland, credit from Harvard Trust Company at the same times as the larcenies charged in indictment numbered 105. G. L. c. 266, § 33.

An indictment numbered 109 in which Taylor and Greenberg with Maitland were charged with the larceny of $14,225 from Beverly Trust Company on November 27, 1953.

Four indictments numbered 99, 101, 102, and 103 in which it was charged in seventy counts that Taylor being an officer and employee of Pilgrim Trust Company was unlawfully the beneficiary of and unlawfully received, directly and indirectly, a fee, commission, gift and other consideration, for and in connection with certain business of said trust company on divers days between July 3, 1952, and February 5, 1954. G. L. c. 172, § 16.

An indictment numbered 63 in which Taylor with Maitland was charged with conspiring from January 1, 1951, to March 16, 1954, the date of the indictment, to steal moneys, goods and chattels of persons unknown to them at the time of such conspiracy.

An indictment numbered 80 in which Greenberg and Taylor, with Maitland, were charged with conspiring from November 1, 1949, to April 9, 1954, the date of the indictment, to obtain with intent to defraud credit from Pilgrim Trust Company by false statements in writing respecting the financial condition and the means and ability to pay of Greenberg and Maitland.

Taylor "having been convicted of more than three separate and distinct larcenies at one sitting of the court as set forth in indictments" numbered 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 104, 105, 106, 107, 108, and 109 and Greenberg "having been convicted of more than three separate and distinct larcenies at one sitting of this court as set forth in indictments" numbered 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, and 109, each was adjudged to be a common and notorious thief and sentenced to not less than three years nor more than five years in the State prison.

The conspiracy indictments numbered 63 and 80 were ordered to be placed on file. On each of the indictments numbered 101 and 103 Taylor was sentenced to pay a fine of $500. Indictments numbered 99 and 102 were ordered to be placed on file. Each defendant requested that in order to protect his right to appeal sentence be imposed on the indictments which had been ordered placed on file. Thereupon the court imposed concurrent sentences of one year in the house of correction on each of the conspiracy indictments to be served from and after the State prison sentences and on each of the indictments numbered 99 and 102 ordered Taylor to pay a fine of $500.

The cases are before us upon the defendants' appeals under G. L. c. 278, §§ 33A–33G, as amended, accompanied by a summary of the record, a transcript of the evidence, and their assignments of error, and upon a substitute bill

of exceptions of Greenberg relating to the disposition of three pleas in abatement filed by him as to the three groups of indictments numbered 70–74, 75–79, and 80.

It appears from this substitute bill of Greenberg that he was arraigned on the indictments against him on April 12, 1954, and pleaded not guilty. He was allowed three weeks "for filing of special pleas." On April 30, 1954, he filed these pleas in each of which he alleged that "the district attorney, or assistant district attorney, present in the grand jury room . . . [practised] acts of guile and intimidation" upon him, he having "appeared before the grand jury voluntarily, as a witness, in the matter of an inquiry of a particular person or persons, all of which had a tendency to influence the action of the grand jury on other grounds"; and prayed "that he may be dismissed and discharged of these said indictments." At a hearing on June 8, 1954, he was allowed one week to file a motion that he be allowed to retract his pleas of not guilty. On June 28, 1954, he filed a motion to be heard on the pleas and be afforded a trial on the merits. This motion was heard on June 29, 1954, at which time Greenberg stated to the court that he did not intend to move to be allowed to retract his pleas of not guilty. The motion for hearing was denied without prejudice. He filed a claim of exceptions to its denial and to the "failure to make rulings upon" seventeen requests for rulings which had been filed in the clerk's office on June 28 but not "physically handed" to the court.

These exceptions should be overruled. By his pleas of not guilty the defendant admitted the validity of the indictments and in effect waived matters in abatement. *Commonwealth* v. *Wakelin*, 230 Mass. 567, 570. *Lebowitch, petitioner*, 235 Mass. 357, 362–363. *Commonwealth* v. *Walsh*, 255 Mass. 317, 319.

The action of the court in permitting the pleas to be filed did not nullify the defendant's waiver nor exhaust the court's power to deal with the pleas according to law. See *Trudel* v. *Gagne*, 328 Mass. 464, 465. The insistence of the defendant upon his pleas of not guilty amounted to an affirmation of his previous waiver and the court was not required to hear

him further on abatement. The defendant has not been harmed as on their face the pleas were insufficient. See *Commonwealth* v. *Geagan, ante,* 487, 496. The general assertions of guile and intimidation on the part of the district attorney or his assistant, like general allegations of fraud, did not merit judicial inquiry. *Butler* v. *Directors of the Port of Boston,* 222 Mass. 5, 8. *Fleming* v. *Dane,* 298 Mass. 216, 218, and cases cited. That Greenberg testified voluntarily at the inquiry by the grand jury did not invalidate the indictments subsequently returned against him. *State* v. *Duncan,* 78 Vt. 364, 368. The requested rulings related to the contention that the court was required to grant a hearing on the merits of the pleas as a matter either of right or of discretion. There was no error in failing to pass upon them.

Taylor seasonably filed motions for particulars. G. L. c. 277, § 40. These were furnished in substantial detail by the Commonwealth. They informed the defendants that the larcenies of money were effected by false pretences through the use of fictitious collateral in the form of false purchase and service orders of departments of the city of Boston and Commonwealth of Massachusetts to Maitland or George J. Maitland Company; and that credit was obtained by written statements regarding the validity of this collateral. The respective parts played by the defendants and Maitland in these larcenies and the obtaining of credit, their respective participation in the conspiracies, and the character of the gratuities received by Taylor were fully set forth. The particulars were adequate to advise the defendants of the nature of the charges and sufficient to enable them to prepare their defences. See *Commonwealth* v. *Hayes,* 311 Mass. 21, 24–26, and cases cited.

A motion that other pending indictments against the alleged coconspirator Maitland be ordered tried with the present indictments was denied. If, as we do not intimate, the judge under G. L. c. 278, § 1, had authority to order cases added to the trial list to which the defendant was not a party and then consolidate them for trial, there was no

abuse of discretion in denying the motion. See *Commonwealth* v. *DiStasio,* 294 Mass. 273, 279–280; *Commonwealth* v. *Sheppard,* 313 Mass. 590, 595.

Taylor claims error in the alleged refusal of the judge, previous to the empanelling of the jury, to examine prospective jurors in accordance with ten proposed questions regarding what they had heard or read of the case and their ability to render a fair verdict. The docket entries contain no references to the filing of any motion and the district attorney has moved that a purported copy of the requested interrogatories printed in the record as part of Taylor's assignment of error be struck out. If the questions were presented to the judge he took no action on them. The jury were empanelled on February 21, 1955. There is nothing in the transcript as to the examination of the jurors. The court adjourned over the holiday to February 23. On that day Taylor saved an exception to the implied denial of his requests. The exception was taken too late and must be disregarded, but if seasonably taken it could not be sustained. By G. L. c. 234, § 28, a judge is required, on motion of a party, to test the indifference of a jury by a prescribed inquiry but further examination is within his discretion. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 334-335. No abuse of discretion appears.

Greenberg and Taylor were tried with one Wren, who was acquitted. The specific charges against him do not appear in the record but we infer it was contended that he supplied the city of Boston forms with which Maitland was alleged to have manufactured bogus orders. Maitland testified as a witness for the Commonwealth. The trial consumed twenty-six court days and lasted from February 21, 1955, to March 30, 1955. The evidence consisted of 306 exhibits and transcribed testimony of approximately 3,000 pages. It is impracticable to state it except in the form of a brief summary, reference to the parties concerned being made by abbreviated designation.

Maitland conducted some form of building material business under the name of George J. Maitland Company at

6 Beacon Street, Boston. Greenberg was engaged in the business of lending money and had a checking account and a line of credit with Pilgrim of $5,000. During the course of the transactions hereinafter discussed his credit on direct loans was increased to $20,000 and on collateral loans to $50,000. Taylor was assistant treasurer and credit manager of Pilgrim, with his office on Milk Street in Boston. All three had been acquainted for several years. Greenberg had worked with Maitland on an O. P. A. project. Taylor, who formerly was a State bank examiner, had met Maitland when the latter was employed by the Exchange Trust Company. In August, 1945, Taylor had arranged for Maitland to borrow $4,000 from Pilgrim but the bank learned of some foreclosure of one of Maitland's chattel mortgages and authorization of the loan was rescinded.

Between 1941 and 1949 Greenberg had made from thirty to forty small loans to Maitland on notes secured by chattel mortgages, some of which had been discounted by Pilgrim. Late in 1949 they had a talk in reference to larger loans to Maitland. Greenberg said chattel mortgages were not very well liked at the bank and asked Maitland if it was possible to get some paper "that we could borrow on that looked official." Maitland said that he could get some city and State paper which could be used and that it looked good so long as it was not checked up but "there could be no notification to the city or the State." He said, "[I]f they started checking the paper, it would blow the top off." Greenberg said that "there would be no investigation by the bank because the loans that were granted to him were granted by the president of the bank and that there would be no checkback." Maitland obtained city of Boston forms for service and purchase orders, filled them out, and handed them to Greenberg with accompanying shipping orders and receipts. Greenberg submitted the papers to the president of Pilgrim and afterwards told Maitland to "straighten them out" and that he could discount them in two or three days with the bank. It was arranged that Maitland would pay Greenberg ten per cent interest for a loan of ninety days of moneys

which Greenberg would obtain from the bank on this collateral. The first assignment of Maitland's spurious collateral by Greenberg to Pilgrim was on July 25, 1950, to secure a loan of $3,500. It was the basis of the charges in count 2 of indictments 71 and 79. Beginning with August 3, 1951, there was a series of similar transactions continuing to February, 1954. They were the bases of the charges in the counts of indictments 70, 72, 73, 74, 75, 76, 77, and 78 other than count 19 of 72 and 76, and counts 1, 2, and 3 of 73 and 77. In the course of these transactions Greenberg received from Pilgrim more than $450,000 and reassigned to it collateral obtained from Maitland approximating in face value $780,000.

The procedure followed was for Maitland to give Greenberg his note for an agreed amount with interest stated to be payable at the rate of five per cent. Such note was accompanied by collateral manufactured by Maitland in the form of service or purchase orders purporting to have been given to Maitland by some department of the city of Boston or Commonwealth of Massachusetts similar to that described in *Commonwealth* v. *Ries*, 337 Mass. 565, 567, and footnote 1. Greenberg would then borrow from the bank on his note accompanied by an assignment of the Maitland note and the collateral as listed in a "schedule of paper" in which it was stated in writing "that all such paper is genuine in all respects." Greenberg's notes secured by the Maitland notes and collateral were discounted at the bank, first at the rate of six per cent per annum, and later at eight per cent. The bank would credit Greenberg's account with the face amounts of his notes less discount. Greenberg would then draw his check to Maitland for the amount of the Maitland note less the deduction of the stipulated ten per cent interest. The Greenberg notes and assigned collateral were kept in the bank's department of assigned accounts of which one Wight was manager. The Maitland notes were sent to the collection department and Maitland would be notified as they fell due. On payment by Maitland of his notes they would be returned to him, and Greenberg's notes and the collateral

returned to him. When Greenberg received back the collateral and schedules he would give them to Maitland who would destroy the papers in Greenberg's presence.

Until late in 1953, Maitland paid all of his notes which had been assigned to the bank. But on February 12, 1954, when as later appears the nature of the collateral was discovered, eight of his notes were unpaid and Greenberg owed the bank $54,950 on his notes to the bank secured by the collateral. Greenberg paid to the bank the face amount of his notes although they had not then matured.

Taylor knew of the transactions of Greenberg and Maitland with the bank. Late in 1951 he had examined the Greenberg folder containing the assigned collateral and had told the custodian not to say anything about it to Wight. In 1952 a clerk in the assigned accounts department said to him, "You had better watch out for this account," and he replied, "Don't worry about it." About the first of July, 1952, he said to Maitland, "I see you have been doing business with Mr. Greenberg," and asked if he, Maitland, was able to get as much money as he needed. Taylor said, "That collateral that you have got in there is pretty rough stuff. . . . I won't bother it where it's been O.K.'d by the president of the bank before me, but if you find that you can use money from other sources . . . I can arrange some loans for you outside of this bank . . . . We can make arrangements at that time as to what you would be able to pay me." Maitland said that the only collateral he had "was the same collateral that was being used on the Greenberg loans, which looked good, and as long as it was not checked we would have no trouble." Taylor said, "[I]f I place any loans . . . those loans will be accepted on my word. There will be no checkup on the collateral." Maitland said "not to put it in these outside banks because . . . [he] was afraid of a notification to the city or the State" and Taylor said that "there would be none." Maitland told him he could get any amount of collateral "that was needed, all he could handle." After this talk Taylor called the president of the Union Market National Bank of Water-

town and asked him about a loan to Maitland. Taylor said he knew Maitland and was familiar with his affairs and that he was in the business of selling equipment supplies largely to the city. After examination of Dun & Bradstreet's report on Maitland by the bank the proposed loan was refused. Taylor spoke with one Green, a money lender, and told him that Maitland's net worth was from $30,000 to $35,000, that he was a customer of Pilgrim, and that there was posted a revolving letter of credit of $50,000 to Maitland. Green was told that the rate of interest would be ten per cent for ninety days, but refused to enter into a loan transaction.

In September, 1952, Taylor introduced Maitland to one Garfield, a money lender, who did business under the name of Shore Finance Corporation. Taylor told Garfield that he had a client who needed money and who had a $30,000 credit with Pilgrim and other credits but that he had reached the loan limit. Garfield agreed to do business with Maitland and to pay Taylor three per cent on each loan made to Maitland at the rate of ten per cent for ninety days. Beginning with October 6, 1952, Shore made thirty-five loans to Maitland which were the bases of the larceny indictments 104, 106, and 108. In the assignments of the collateral to Shore, Maitland stated in writing that each account scheduled "arises from a bona fide sale and . . . that the merchandise herein mentioned has been delivered to and accepted by the debtors therein named." All checks from Shore to Maitland, except one or two, were mailed to Taylor and the Maitland notes, when paid, were returned to him. On two occasions when Garfield discounted Maitland's notes at a bank Taylor told him that this should not be done as there was to be no notification or checkup. Beginning in 1953 the rate of interest charged by Shore on the loans was raised to twelve per cent and the last loan on January 16, 1954, was at a rate of ten per cent for forty-five days. Garfield paid Taylor $4,000 in commissions. On February 12, 1954, unpaid notes of Maitland to Shore amounted to $47,000.

In 1953 Taylor arranged for loans to Maitland by one Kaneb who lent money through two corporations, Atwater

Fuels and Manomet Company. Taylor told Kaneb that Maitland had been getting paid promptly by the city and that he had seen checks from the city. Early loans by Kaneb through Atwater Fuels to the amount of $35,000 were repaid, but later loans to the amount to $104,000 made through Manomet Company were never repaid. Kaneb paid Taylor a total of $900 in commissions.

Taylor made an appointment with one Jones, vice-president of Harvard, to meet Maitland on January 22, 1953. Thereafter Harvard made twelve loans to Maitland on his notes secured by the fraudulent collateral which were the bases for indictments 105 and 107. After each loan Jones told Taylor what had been assigned. In June, 1953, he told Taylor that the Maitland loans amounted to $22,000, an amount larger than he expected. In reply Taylor said Maitland could do more business if he had more funds. He said that he had cashed city checks for Maitland. Taylor wrote to Jones saying that Maitland's average account with Pilgrim was in the "high four to low five figures" meaning that it was from $7,000 to $12,000. In his assignment of collateral to Harvard Maitland said in writing, "We hereby certify that said account is a bona fide and correct account for goods actually sold and delivered and/or services rendered."

On February 11, 1954, Taylor having called Jones and told him that Maitland wanted an extension of his note for $8,000 which was due the next day, Jones started an investigation and learned from the city auditor of Boston that the Maitland collateral was fictitious. Maitland's notes to the bank totaling $21,500 have remained unpaid.

On November 27, 1953, Taylor arranged with one Corning, vice-president and treasurer of Beverly, to lend $15,000 to Greenberg on assignments by Maitland of city of Boston invoices. The proposed loan had been discussed by Greenberg, Maitland and Taylor. Greenberg received a check for $14,775 and gave it to Taylor, who deposited it in Maitland's account at Pilgrim. Taylor notified the teller that it was to be credited to Maitland as cash. From the proceeds of the deposit $5,582.50 was used to pay a Maitland

note assigned by Greenberg to Pilgrim, $7,692.50 was credited to Maitland's account, and $1,500 was given by Maitland in cash to Taylor.

Beginning in October, 1952, and continuing until the discovery of the fraud in 1954, Maitland paid Taylor $50 a week for his services in arranging for Maitland's checks to be credited as cash and in obtaining outside funds from which Maitland was enabled to reduce his loans at Pilgrim and to continue his borrowing. See indictments numbered 99, 101, 102, and 103.

Early in 1954 Taylor had told Murphy, the bookkeeper at Pilgrim, when Maitland was overdrawn, that if he "needs money, there will be a deposit, or we can hold it over, can't we? . . . if he needed money, 'I will have it in here.'" At about the same time Green told Taylor that he was about to lend $15,000 to Maitland and Taylor told him that some of Maitland's checks were acting "funny" and that he was "swapping" checks around.

Motions of each defendant presented at the conclusion of the evidence that the Commonwealth be required to elect whether it would proceed under the indictments charging larceny under G. L. c. 266, § 30, as amended, or under those charging the fraudulent obtaining of credit under G. L. c. 266, § 33 (2), as amended through St. 1945, c. 282, § 3, were denied. Section 30 provides that whoever obtains the property of another, as therein defined, by a false pretense shall be guilty of larceny. Section 33 (2) provides that whoever "with intent to defraud, by a false statement in writing respecting the financial condition, or means or ability to pay, of himself or of any other person, obtains credit from any bank or trust company" shall be guilty of larceny.

These sections declare distinct offences although classified as larcenies. In one it is the theft of property as defined in the statute which is penalized; in the other the fraudulent obtaining of credit. In *Commonwealth* v. *Ismahl*, 134 Mass. 201, 202, a case where the defendant was charged in one count with keeping a house of ill fame and in a second count

with maintaining a disorderly house, it was held that "[e]ven if the evidence disclosed but one series of facts or transactions, and both counts had relation to the same house and time, and the same acts done in said house, the defendant could not of right demand that the prosecuting officer should elect on which of the two counts he would go to the jury." It was a matter within the discretion of the judge. See *Pettes* v. *Commonwealth*, 126 Mass. 242; *Commonwealth* v. *Rosenthal*, 211 Mass. 50; *Commonwealth* v. *Baldi*, 250 Mass. 528, 535. There was no error in the denial of the motions.

At the conclusion of the evidence each defendant filed motions for directed verdicts on the indictments applicable to him. Taylor also moved for directed verdicts on the indictments against him because of variances between the indictments and the proof. These motions relating to alleged variances require no discussion. The evidence was substantially in accord with the allegations in the indictments and the particulars. See *Commonwealth* v. *Dean*, 109 Mass. 349, 352.

There was evidence sufficient to warrant findings that previous to July 25, 1950, and within the period alleged in the conspiracy indictment 80, Maitland and Greenberg planned to obtain money from Pilgrim on notes signed by Greenberg secured by the assignment of notes of Maitland and fictitious collateral supplied by him in the form of city and State purchase and service orders to him or to George J. Maitland Company. In pursuance of this plan they engaged in and completed approximately sixty-six transactions with the bank in which Greenberg gave his notes secured in the manner agreed upon with false statements as to the validity of the collateral security. He thereby obtained credit from the bank to the amount of the face of his notes, less discounts, and he withdrew from the bank moneys to the extent of the credit so obtained. It is conceded that the collateral supplied by Maitland and pledged with the bank was spurious. That Greenberg knew or believed it to be valueless could be found not only from Maitland's testi-

mony but from Greenberg's own conduct and from the nature and extent of the transactions. There was nothing in Greenberg's prior dealings with Maitland which would justify him in believing that Maitland had a business of the magnitude which the amount of collateral furnished would indicate. See *Commonwealth* v. *Farmer*, 218 Mass. 507, 511. Maitland's readiness to pay ten per cent interest on ninety day loans and his insistence that no notification be given the debtor were sufficient to create in the ordinary mind at least a suspicion that the assigned contracts were not genuine. The Maitland notes were written with a provision for interest at the rate of five per cent per annum and Greenberg assigned them without disclosing to the bank the fact that he was receiving interest at the rate of ten per cent for ninety days. He stipulated with the bank that there should be no notification of the debtor or checkup of the contracts.

The jury could find that Greenberg and Maitland, in connection with their plans to obtain money from Pilgrim, combined to obtain credit from Pilgrim by means of false statements in writing as to the validity of the collateral security furnished as charged in indictment 80. They could further find that they obtained credit and stole money from the bank substantially as charged in indictments 70 to 79, inclusive. The statements in writing to which § 33 (2) refers are not restricted to balance sheets or statements of net worth as contended by the defendants. When collateral to secure a note is given by the borrower it furnishes the lender with the means of obtaining payment of the note and demonstrates to the extent of its value the ability of the borrower to pay. A statement by the borrower that it is genuine plainly relates to his means and ability to pay. See *Group* v. *State*, 94 Okla. Crim. 401; *Commonwealth* v. *Boyd*, 181 Ky. 382; *Branham* v. *State*, 96 Ga. 307.

The offence of larceny by false pretences is committed when there is a false statement of fact known or believed by the defendant to be false made with the intent that the person to whom it is made should rely upon its truth, and such person does rely upon it as true and parts with per-

sonal property as a result of such reliance. *Commonwealth* v. *Green*, 326 Mass. 344, 348. "It is enough . . . if the fraudulent representation . . . [is] a decisive although not the sole influence operating upon the mind of the person to induce the giving up of money. Other statements or considerations not amounting to false pretenses may co-operate to that result without impairing the force of the criminal act." *Commonwealth* v. *Farmer*, 218 Mass. 507, 513.

Greenberg's line of credit with Pilgrim on collateral loans was increased to $20,000 on July 31, 1951, and to $50,000 in 1952. It could be found that the decisive influence in granting these increases and in making the consequent loans to Greenberg was the bank's reliance on the validity of his collateral. That Greenberg received moneys from the bank in the form of loans is no defence to the charge of larceny. The bank was defrauded when it advanced the moneys relying on the false representations as to the validity of the collateral. *Commonwealth* v. *Coe*, 115 Mass. 481, 482, 502. *Commonwealth* v. *Langley*, 169 Mass. 89, 95. There was no error in denying Greenberg's motions for directed verdicts on the counts of indictments 70 to 79 other than on counts 1 and 3 of the indictments 71 and 79, count 19 of indictments 72 and 76, and counts 1, 2, and 3 of indictments 73 and 77. The evidence as to these counts did not warrant findings that Greenberg obtained the money and credits therein referred to by reason of assignment to the bank of Maitland's collateral. On these counts the judge should have directed the jury to return verdicts of not guilty.

Greenberg could properly be found guilty of larceny of $14,225 from Beverly as charged in indictment 109. The money obtained was in fact $14,775. It was obtained in the form of a loan by the use of fraudulent collateral similar to that employed in the transactions with Pilgrim.

It appears from the evidence that Taylor became a party to the conspiracy of Greenberg and Maitland about July 1, 1952. Although previous to that time he had reason to know that Pilgrim was lending money to Greenberg on

doubtful security supplied by Maitland, we think it could
not be inferred beyond a reasonable doubt that his active
participation in their scheme began before that time. It was
then that he told Maitland that he would not interfere with
the use of the "rough stuff" being used by the other two,
offered his assistance in obtaining money for Maitland
from other sources, and commenced the practice of author-
izing Maitland's checks to be credited as cash. It could be
found that his assurance of noninterference, procurement of
outside loans, and acceptance of Maitland's checks as cash
materially encouraged and assisted the other two in con-
tinuing their larcenies from Pilgrim. See *Commonwealth* v.
*Mycock*, 315 Mass. 262, 267. In October, 1952, Maitland
began to pay Taylor $50 a week, which payments could be
found to have been in consideration of this noninterference
and assistance. Taylor could be found guilty of being a
party to the conspiracy charged in indictment 80. *Common-
wealth* v. *Corcoran*, 252 Mass. 465, 487.

He could also be found guilty of the larcenies from Pil-
grim charged in indictment 70, in counts 12 to 24 except
count 19 of indictment 72, and in indictment 74, all of which
related to larcenies from Pilgrim committed after July 1,
1952. We think his motions for directed verdicts as to in-
dictment 71, counts 1 to 11 and count 19 of indictment 72,
and indictment 73, wherein he was charged jointly with
Greenberg and Maitland in larcenies from Pilgrim before
July 1, 1952, should have been allowed.

What has been said in reference to the indictments and
counts under § 30 applies to indictments 75 to 79, inclusive,
under § 33 (2). The evidence was sufficient to warrant find-
ings of Taylor's guilt under indictment 75, counts 12 to 24
except count 19 of indictment 76, and indictment 78. His
motions as to counts 1 to 11 and count 19 of indictment 76,
and indictments 77 and 79 should have been allowed.

There was sufficient evidence to warrant a finding of his
guilt in conjunction with Greenberg of a larceny from
Beverly as charged in indictment 109. It could be found
that he arranged the loan to Greenberg with knowledge

that the collateral to be used was fraudulent and that he received a portion of the money obtained.

There was no error in denying Taylor's motions for directed verdicts on indictments 104, 106, and 108 charging him jointly with Maitland with larcenies from Shore. There was evidence that he arranged the loans, handled checks received, authorized them to be credited by Pilgrim as cash, and provided against notification by Shore to the city of Boston, knowing the collateral to be spurious. He accepted payments by both Maitland and Garfield for his services in connection with the loans.

There was no error in denying Taylor's motions for directed verdicts on indictments 105 and 107 charging him in conjunction with Maitland with larcenies under § 30 from Harvard and with the fraudulent procurement of credit, under § 33 (2) from Harvard. He arranged for the credit and the consequent lending of money to Maitland on the spurious collateral. He was jointly responsible with Maitland for the certifications in writing that the accounts assigned were for goods sold and for services rendered. "If two parties are working with a common purpose to obtain the money of another by false pretences, both are criminally liable. 'The act of one . . . [is] the act of both.'" *Commonwealth* v. *Morrison*, 252 Mass. 116, 123.

There was no error in denying Taylor's motion for a directed verdict on indictment 63 which charged him with conspiring with Maitland to steal money from time to time from persons then unascertained. The formation of a conspiracy could be found from the evidence as to his talks with Maitland and the subsequent transactions promoted by him for Maitland with Shore, Kaneb and Harvard.

There was evidence that Maitland paid Taylor $50 weekly for his services during the last twelve weeks of 1952 and continuing until February, 1954. The receipt of these fees or commissions by Taylor was the subject of indictments 99, 101, 102, and 103. They could have been found to have been received in connection with the business of the trust

company and to have been violations of G. L. c. 172, § 16, as amended. *Commonwealth* v. *Ries,* 337 Mass. 565, 575–578. We think Taylor was entitled to directed verdicts on counts 1, 2, 3, and 4 of indictment 102 in which he was charged with receipt of fees or commissions before the time when it appears Maitland began to pay him. There was no error in refusing to direct verdicts on indictments 99, 101, 103, and counts 5 to 10, inclusive, of indictment 102.

Taylor filed 795 assignments of error of which forty-two have been expressly waived. Greenberg has filed 357 of which several have not been argued and therefore may be considered waived. In our consideration of the preliminary motions and pleas, the motions to elect, and the motions for directed verdicts, we have disposed of the assignments relating to those subjects. We turn to the assignments based on exceptions to rulings on the admission and exclusion of evidence and on the denial of motions for a mistrial. It is not feasible to discuss each of the assignments separately, and since most are capable of substantially accurate classification they will so far as practicable be dealt with in groups.

A large number relate to the admission in evidence as exhibits of checks, deposit slips, notes, assignments, schedules and bank records concerning the transactions already described. Much of this documentary evidence was admitted under G. L. c. 233, § 78, as amended by St. 1954, c. 442, § 1, to apply to criminal proceedings. This statute provides that records shall not be inadmissible because of hearsay as evidence of the facts therein stated "if the court finds that the entry, writing or record was made in good faith in the regular course of business and before the beginning of the civil or criminal proceeding. . . ." The defendants contend that the amendment of 1954 was intended to be prospective in its application and that it does not apply to the trial of offences committed before September 1, 1954, its effective date.

Statutes relating merely to the remedy or procedure which do not affect substantive rights are generally held to operate

retroactively. *Greenaway's Case*, 319 Mass. 121, 123. *E. B. Horn Co.* v. *Assessors of Boston*, 321 Mass. 579, 584. The statute in question relates to the admissibility of evidence and is procedural. *Kerr* v. *Palmieri*, 325 Mass. 554, 557. It simply extends the existing statutory rule to criminal cases and deprives the defendants of no substantive rights. *Commonwealth* v. *Bellino*, 320 Mass. 635, 641–642, and cases cited. It provides a practical method of presenting evidence without calling a large number of witnesses and may be as helpful to defendants as to the prosecution. It is not a statute which changes the rules of evidence to the detriment of the defendant. See *Lembersky* v. *Parole Bd. of the Dept. of Correction*, 332 Mass. 290. It was held in *American Locomotive Co.* v. *Hamblen*, 217 Mass. 513, 515, that the original St. 1913, c. 288, of which the present statute is a revision, stated "a rule of evidence and applied to all trials occurring after it became effective, including those in which the cause of action accrued and had been put in suit before its passage."

The defendants rely upon *Commonwealth* v. *Homer*, 153 Mass. 343, a case in which the defendant was charged with attempted abortion, where it was held by a majority of the court that a statute enacted after the alleged offence providing that the dying declarations of the woman victim of an abortion could be admitted in evidence was intended to be prospective and that the dying declarations of the victim were wrongly admitted. The statute in that case established a rule of evidence limited in its application to proof of the particular type of offence with which the defendant was charged and appears to have been held by the court, if applied retroactively, to be ex post facto legislation. We think it is not authority for the position taken by the defendants in the present cases. See *Beazell* v. *Ohio*, 269 U. S. 167, 170–171. There was no error in the admission of the documents. In the absence of evidence to the contrary their admission by the judge imported a finding that the conditions of admissibility contained in the statute had been satisfied. *O'Brien* v. *Bernoi*, 297 Mass. 271, 274. *Sellew* v. *Tuttle's Millinery Inc.* 319 Mass. 368.

The testimony of Greenberg before the grand jury was offered in evidence by the Commonwealth and admitted subject to the defendants' exceptions. It was restricted by the judge in its application to the indictments against Greenberg. Later in the trial motions for a mistrial were filed by both defendants because of its admission. Taylor contended that notwithstanding the restriction of its application he was harmed by its admission and Greenberg that it contained nothing in the way of admissions by him. Neither contention is sound. "An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish his guilt." *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347. The testimony related to the transactions which were in issue and was plainly admissible against Greenberg. Taylor was adequately protected by the ruling of the judge. There was no error in the denial of the motions. See as to motions for mistrial *Commonwealth* v. *Bellino*, 320 Mass. 635, 644–645.

Bank officials and others were properly allowed to testify that in making or authorizing loans to Greenberg and Maitland they relied on the validity of the collateral offered and that if they had known the collateral to be fictitious they would not have approved the loans. See *Commonwealth* v. *Green*, 326 Mass. 344, 348. There is no merit in the numerous exceptions to the admission of evidence of this kind.

Many of the assignments of error of each defendant were based on exceptions to the form and relevancy of questions propounded in direct examination by the district attorney, to the exclusion of questions by counsel for the defendants on cross-examination, and to the denial of their motions to strike answers to questions previously admitted. An examination of the record discloses no rulings in these respects which can be held reversible error. How far the cross-examination of a witness may be relevant to the issues on trial may be left largely to the sound discretion of the judge. Questions of relevancy as well as those of form are not

open to revision unless substantial rights of a party are clearly shown to have been prejudiced. *Commonwealth* v. *Phelps,* 210 Mass. 109, 114. *Commonwealth* v. *Kaplan,* 238 Mass. 250, 255–256. *Commonwealth* v. *Corcoran,* 252 Mass. 465, 486. *Commonwealth* v. *Coshnear,* 289 Mass. 516, 527. *Commonwealth* v. *Granito,* 326 Mass. 494, 496. Each defendant assigned as error the admission against him of evidence of the individual acts and declarations of the other defendant and of Maitland. There was evidence sufficient to warrant findings that prima facie cases of conspiracy had been made out under both indictment 80 and indictment 63 and evidence of the acts and declarations of each conspirator in furtherance of the object of the conspiracy was admissible against the others. *Commonwealth* v. *Shea,* 323 Mass. 406, 414. The evidence was necessarily presented by degrees. Exceptions were saved to each piece of evidence as admitted. In each instance the evidence appears to have been pertinent to the proof of the conspiracy as to which it was offered and no error appears in the refusal to restrict its applicability.

As to several witnesses called by the Commonwealth the district attorney sought to refresh their recollection by showing them written statements purporting to have been made by them. There was no error in the denial of requests by the defendants that they be permitted to inspect the statements before their submission to the witnesses. While a writing which has been used to refresh the recollection of a witness may be examined by the opposing party to enable him by cross-examination to raise the question whether it is a proper memorandum for the purpose, *Capodilupo* v. *F. W. Stock & Sons,* 237 Mass. 550, 551, *Bendett* v. *Bendett,* 315 Mass. 59, 62, *Leonard* v. *Taylor,* 315 Mass. 580, 583, he is not entitled to inspect the writing before it has been shown to the witness. *Commonwealth* v. *Burke,* 114 Mass. 261.

The Commonwealth called as a witness an accountant who had collated the checks and deposit slips of Greenberg and Maitland which had been admitted in evidence and had listed their dates and the amounts on large charts which

were shown to the jury and later admitted in evidence. The defendants assigned as error the admission of these charts. In view of the large number of transactions involved in the trial and the multiplicity of the exhibits bearing on those transactions, the judge could properly find that concise schedules demonstrating the transactions would be helpful to the jury. It was said in *Boston & Worcester R.R.* v. *Dana*, 1 Gray, 83, 104, that "in a trial embracing so many details and occupying so great a length of time as the case at bar, during which a great mass of books and documents were put in evidence," concise statements of their content verified by persons who had prepared them from the originals were the only means for presenting to the jury an intelligible view of the issues involved. *Jordan* v. *Osgood*, 109 Mass. 457, 464. *Cornell-Andrews Smelting Co.* v. *Boston & Providence R.R.* 215 Mass. 381, 390–391. The witness was not allowed to state deductions and inferences of his own but could state only the results of his computations from the admitted evidence. See Wigmore on Evidence (3d ed.) § 1230. He was permitted, properly, to point out the apparent relation of the dates and amounts of Maitland's deposits at Pilgrim to those of the loans received from Shore, Harvard and Beverly.

During the course of the trial the defendants by either cross-examination or direct testimony attempted to introduce evidence of the use by Maitland of his fraudulent collateral in loan transactions with other banks and loan agencies. It was their contention that if other persons were misled as to the validity of the Maitland collateral the evidence would tend to support their claim that they were justified in relying upon it as genuine. They also contended that it could be inferred Maitland was using the proceeds of other loans to make his payments on the notes held by Pilgrim and that the scheme to defraud Pilgrim was solely planned and carried out by him. The judge was warranted in excluding this line of evidence. It raised independent issues of inquiry collateral to those pertaining to the indictments, and while having no rational tendency to controvert

the Commonwealth's evidence relating to the two defendants would have unduly protracted the trial.

The defendants introduced evidence through their own testimony and that of other witnesses. After they had rested the judge allowed motions by the Commonwealth that the evidence given by each defendant and his witnesses be applied to the other defendant so far as it was applicable. There was no error. The testimony of each defendant and his witnesses was competent for and against the other defendant. *Commonwealth* v. *Brown*, 130 Mass. 279. See *Commonwealth* v. *Wood*, 302 Mass. 265, 267–268.

The evidence was concluded late in the afternoon of March 29, the twenty-fifth day of trial. The judge conferred with the attorneys, and in response to his inquiry whether the defendants intended to present requests for rulings, counsel for Greenberg and Taylor presented 582 requests and counsel for Wren twelve. The judge referred them to *Hogan* v. *Coleman*, 326 Mass. 770, and advised them "that it would be humanly impossible for any court to analyze the requests as presented." No effort was made by counsel to curtail the number of requests presented. The judge did not attempt to pass upon the requested instructions.

On the following day there were arguments of counsel and the judge charged the jury without passing upon the requests. He correctly instructed the jury as to the burden of proof and the rule as to presumption of innocence. He defined the crimes of conspiracy, of obtaining money by false pretences and of larceny by use of a false statement in writing. He read to the jury §§ 30 and 33 (2) of c. 266, and § 16 of c. 172 respecting the receipt of gratuities by a bank officer. He briefly stated the Commonwealth's contentions and advised the jury that arguments of counsel were not evidence. He informed them that for the purpose of admitting or excluding evidence he found as a prima facie matter that there was a conspiracy but that it was for the jury to determine on all the evidence whether a conspiracy existed. He illustrated his statement that the fact

that money was repaid does not absolve one from the commission of larceny, employing as a pertinent example the act of a bank clerk who had taken a bank's money but with the intent to repay it.

We find no error in the charge. The judge did not attempt to review the evidence. He pointed out the issues which it was for the jury to determine and the law applicable thereto.

We know of no practical rule by which to determine the number of requests for instructions which can properly be presented to a judge and entertained by him. It depends upon the character of the case, the complexity of the issues on which the jury must pass and the relevancy to such issues of the requested instructions. While a defendant, in a criminal case, is entitled to have the issues of fact clearly presented to the jury and the law applicable thereto carefully explained, the method and extent of the charge must be left to the discretion of the judge. It is not to be expected that he shall discuss every subsidiary fact and possible inference. See *Commonwealth* v. *Polian*, 288 Mass. 494, 499; *Commonwealth* v. *Beal*, 314 Mass. 210, 231.

We have never held that requests for instructions could rightly be disregarded because of their unreasonable number although it was said in *Hogan* v. *Coleman*, 326 Mass. 770, 773, that "where the number of requests is palpably in excess of the number legitimately needed in a case the trial judge has the power either to order them stricken from the files, or to require a party to reduce them to a reasonable number or risk the loss of any rights under them."

The number of requests presented to the judge in the present trial seems to us to have been unreasonable. It was of course not expected by counsel that the judge would read to the jury all of these requests. The burden was placed upon him of sifting out those which were appropriate and correct in law and then incorporating them in a charge which would adequately instruct but not confuse the jury. We fear that the submission of this multitude of requests was designed, not to insure an adequate charge, but

to provide a foundation for exceptions. The judge was warranted in refusing to pass upon the requests. See *Baker* v. *Thompson,* 337 Ill. App. 327; *Crawshaw* v. *Sumner,* 56 Mo. 517; *Desberger* v. *Harrington,* 28 Mo. App. 632; *O'Neil* v. *Dry Dock, East Broadway & Battery R.R.* 129 N. Y. 125; *Angerosa* v. *White Co.* 248 App. Div. (N. Y.) 425, affd. 275 N. Y. 524; *Yazoo & M. V. R.R.* v. *Dees,* 121 Miss. 439.

At the conclusion of the charge counsel read into the record the requested instructions which it was contended had not in substance been given. Many were correct statements of law but we find none which the judge was required to give. The contention of the defendants seems to be that the charge as a whole was insufficient to present properly the issues of fact and the law applicable thereto. It is true that the charge was quite brief and the judge did not attempt to review the evidence. He gave, however, adequate instructions as to the principles of law applicable to the trial of a criminal case and stated accurately the pertinent substantive law. He defined conspiracy and quoted the statutes relating to the obtaining of money by false pretenses and the obtaining of credit by false statements in writing. Doubtless he felt that after a long trial with its running incidents of objections, rulings and exceptions in relation to evidence the jury were fully aware of the factual issues presented for their determination and that a protracted discussion of the evidence would be confusing and inadvisable. See *Herrick* v. *Waitt,* 224 Mass. 415, 416–417.

The test of the sufficiency of a charge is the impression created by it as a whole. *Commonwealth* v. *Aronson,* 330 Mass. 453, 457. Whether a judge shall read or state the substance of a statute must be left to his discretion. *Commonwealth* v. *Burns,* 167 Mass. 374, 379. Having given the jury correct rules for their guidance he is not required to go further and discuss possible findings of fact upon which a defendant might be acquitted. *Commonwealth* v. *Payne,* 307 Mass. 56, 58.

Each defendant assigned as error the judge's adjudication

of him under G. L. c. 266, § 40, of being a common and notorious thief. As each had been convicted of more than three distinct larcenies the adjudications and sentences were mandatory. *Collins* v. *Commonwealth,* 315 Mass. 167.

We have examined all assignments of each defendant. Except as to the rulings on certain motions for directed verdicts there was no reversible error. If in some instances evidence for the Commonwealth of doubtful competency was admitted and evidence for the defendants of remote relevancy excluded, it does not appear that either defendant has been harmed. See *Bendett* v. *Bendett,* 315 Mass. 59, 65–66.

The exceptions of Greenberg are overruled.

The judgments against Greenberg on indictments 70, 74, 75, 78, 109, and 80, count 2 of indictments 71 and 79, all counts except count 19 of indictments 72 and 76, and counts 4 to 9, inclusive, of indictments 73 and 77 are affirmed.

The judgments against Greenberg on counts 1 and 3 of indictments 71 and 79, count 19 of indictments 72 and 76, and counts 1, 2, and 3 of indictments 73 and 77 are reversed and the verdicts set aside.

The judgments against Taylor on indictments 70, 74, 75, 78, 99, 101, 103 to 109, inclusive, indictments 63 and 80, counts 12 to 24, inclusive, except count 19 of indictments 72 and 76, and counts 5 to 10, inclusive, of indictment 102 are affirmed.

The judgments against Taylor on indictments 71, 73, 77, 79, counts 1 to 11, inclusive, and count 19 of indictments 72 and 76, and counts 1 to 4, inclusive, of indictment 102 are reversed and the verdicts set aside.

*So ordered.*