COMMONWEALTH *vs.* JOSEPH W. MONAHAN, JR. & another.

Suffolk.    March 1, 1965. — May 3, 1965.

Present: WILKINS, C.J., SPALDING, KIRK, SPIEGEL, & REARDON, JJ.

*Larceny. Conspiracy. Massachusetts Parking Authority. Evidence,* Consciousness of guilt; Recalcitrant witness; Judicial discretion; Absence of fact; Leading question; Hostile witness; Telephone conversation; Relevancy and materiality; Opinion: expert; Photostatic copy; Of hearing words; Public record; Business record. *Practice, Criminal,* Grand jury proceedings; Examination of jurors; Abatement; Exceptions: whether error harmful; Requests, rulings and instructions. *Grand Jury. Witness,* Recalcitrant witness, Hostile witness, Expert witness. *Jury and Jurors. Error,* Whether error harmful.

Conviction upon an indictment for larceny from the Massachusetts Parking Authority was warranted on evidence that the defendant, scheming for his own benefit, falsely represented that an engineering concern with which he was associated had entered into an agreement with the Authority to act for it as "construction engineer" upon a garage project and that the defendant was the concern's authorized agent, that he attempted to conceal his scheme by composing false letters and documents, that pursuant to the scheme he prepared and submitted to the Authority a series of invoices which falsely represented that certain services had been performed by the concern, or by the defendant on its behalf, in the role of "construction engineer," whereas the services had not been performed, that the defendant intended the Authority to rely on the representations in the invoices and approve them and issue corresponding requisitions for their payment to its "construction fund trustee," that the Authority did so, that the defendant falsely certified the propriety of the requisitions, intending the trustee to rely on such certifications and issue checks against the construction fund payable to the concern, that the trustee was thereby caused to issue the checks, and that the defendant deposited the checks in his own bank accounts and the concern never received any of the proceeds thereof.    [150–151]
At the trial of an indictment for larceny of money against two defendants, one defendant's initial denial of receiving any money from the second defendant was evidence of the first defendant's consciousness of guilt where he subsequently testified that money received by him from the second defendant represented loans.    [153]
Conviction upon an indictment for larceny from the Massachusetts Parking Authority was warranted on evidence supporting findings that, while the defendant was a member of the Authority, he was a party to an illicit scheme of an associate of an engineering concern to obtain

# 140

349 Mass. 139

Commonwealth *v.* Monahan.

money from the Authority's fund for the construction of a garage in the hands of its "construction fund trustee," that the defendant approved false invoices submitted to the Authority by the associate purportedly for engineering services performed for the Authority and signed some of the corresponding requisitions on the trustee to pay therefor out of the construction fund, that in doing so the defendant knew the associate had not performed the services listed and did not intend to do so, that the defendant intended the trustee to rely on the requisitions as stating proper obligations of the Authority and proper charges against the construction fund, and to issue checks in payment thereof against the fund, that the trustee did so rely and issued checks against the fund payable to the engineering concern which were appropriated by the associate, and that the associate paid substantial amounts to the defendant. [152-153]

Conviction of an associate of an engineering concern and a member of the Massachusetts Parking Authority upon an indictment for conspiring to commit larceny from it was warranted on evidence of concerted action by both defendants in furtherance of a common scheme to obtain money of the Authority by means of false invoices for purported engineering services and consequent requisitions on the Authority's funds in payment of the invoices. [153-154]

At the trial of an indictment for conspiracy against three defendants, evidence admitted as against two defendants only was subsequently properly admitted as against the third defendant upon the introduction of sufficient evidence that a conspiracy had existed and that the third defendant had participated in it. [154]

There was no error in the denial of motions to dismiss indictments against a member of the Massachusetts Parking Authority for larceny and for conspiracy to commit larceny from it on the ground that prejudicial publicity by newspaper, radio and television had biased the grand jury against the defendant, or in the denial of the defendant's motions to examine the grand jurors with respect to the effect of the publicity and to examine an Assistant Attorney General with respect to his issuance of press releases. [154-156]

At the trial of indictments for larceny and for conspiracy to commit larceny from the Massachusetts Parking Authority against a member of the Authority, at which the judge in the selection of the jury put the statutory questions to the prospective jurors, there was no merit in a contention by the defendant that "massive publicity" linking him to the alleged crimes rendered a denial of his motion for further questions to the prospective jurors to determine their impartiality an abuse of discretion. [156-157]

Although the presence of unauthorized persons in a grand jury room during its deliberations would be a valid ground in law of a plea in abatement to an indictment returned by it, on the record there was no error in a denial of a plea so grounded where at the hearing on the plea there was no evidence that any unauthorized person had been in the grand jury room. [157-158]

No provision of G. L. c. 234, § 26B, or of the State or Federal Constitutions prohibited the judge, after a jury of fourteen members had been

Commonwealth *v.* Monahan.

empanelled and sworn for the trial of a criminal case likely to be protracted but before the actual commencement of the trial, from excusing a juror and ordering another juror to be drawn and empanelled. [158–160]

There was no abuse of discretion in a criminal case in permitting the prosecutor to insist on responsive answers by a recalcitrant witness for the Commonwealth who had given repeated unresponsive answers to questions. [160]

At the trial of indictments for larceny and conspiracy to commit larceny from the Massachusetts Parking Authority, after a witness for the Commonwealth had testified that conversations concerning his budget estimate for the Authority did occur and that certain people were ordinarily involved in such matters, there was no prejudicial error in permitting questions to the witness on direct examination as to the identity of persons with whom he "probably" spoke in connection with the estimate. [161]

At the trial of indictments for larceny and conspiracy to commit larceny from the Massachusetts Parking Authority, any error in permitting the prosecutor to ask the Authority's accountant whether he had seen any reference in its minutes to a purported contract before it was established that he had himself examined the minutes was harmless in view of his later testimony that only he could have examined the minutes. [161–162]

There was no abuse of discretion at a criminal trial in a ruling that a certain witness for the Commonwealth was hostile and in permitting the prosecutor to put a leading question to him. [162–163]

In view of the testimony of a witness at a criminal trial that he had had a telephone conversation with a certain person, there was no error in allowing a question to him later whether the conversation had anything to do with a relevant matter. [163]

At the trial of indictments for larceny and conspiracy to commit larceny in connection with a certain matter, questions in cross-examination of a witness for the Commonwealth concerning various financial arrangements between him and a defendant in other matters were properly excluded as irrelevant. [163–164]

There was no error at a criminal trial in the admission in evidence of a witness's transcription of her stenographic notes of a dictation to her by a defendant even though the witness was not certain that her notes had been transcribed "verbatim" and she had corrected an obvious typographical error as to the date of the transcription. [164]

The owner of a printing company which printed stationery was properly allowed to testify in a criminal case, without being qualified as an expert, as to whether she had observed anything unusual about a large capital in a name on a letterhead. [165]

There was no abuse of discretion on the part of the judge at the trial of a criminal case in determining, on the basis of a recital by a witness of his experience and training in chemistry, that the witness was qualified as an expert to give his chemical analysis of the printing powders used in certain raised letterheads in evidence. [165]

At the trial of indictments for larceny and conspiracy to commit larceny from the Massachusetts Parking Authority through a scheme whereby one of the defendants would purport to act as "construction engineer" for the Authority on a garage project and be paid for unrendered services billed, evidence that that defendant had not registered as a professional engineer under G. L. c. 112, § 81R, as amended by St. 1958, c. 584, § 9, was some evidence that he lacked the qualifications required for such registration and that he did not intend or was unable to perform the duties of "construction engineer." [165–166]

At the trial of indictments for larceny and conspiracy to commit larceny from the Massachusetts Parking Authority through a scheme whereby one of the defendants would purport to act as "construction engineer" for the Authority on a garage project and be paid for unrendered services on spurious bills approved by the other defendant, a member of the Authority, who falsely certified requisitions for payment of the bills, evidence of the work the defendant member was expected to do as a member and of his understanding of the timing and amounts of the bills to be submitted by the purported engineer was properly excluded as irrelevant. [166–167]

There was no abuse of discretion by the judge at the trial of indictments in the admission in evidence under G. L. c. 233, § 79E, of properly identified photostatic reproductions of relevant checks. [167]

Evidence at the trial of indictments that a conversation occurred in a defendant's "presence" supported an inference that he had heard the conversation and made it admissible against him as showing that he thereby acquired certain relevant knowledge. [167–168]

There was no reversible error at the trial of indictments in permitting the Commonwealth to introduce in evidence relevant parts of the minutes of a public Authority without introducing the minutes in their entirety. [168–169]

At the trial of indictments for larceny and conspiracy to commit larceny from the Massachusetts Parking Authority against a member of the Authority and another defendant, a part of the Authority's financial statement prepared by a third person but approved by the member, which recited a certain sum as representing payments to the other defendant, was admissible to contradict the member's testimony that a purported contract approved by him and providing for payment of a smaller sum to the other defendant was authentic. [169]

A record of the Massachusetts Parking Authority was not inadmissible under G. L. c. 233, § 78, at a criminal trial because the witness who introduced it was not the keeper of the Authority's records or because it contained a notation by the witness of a certain material date; in the absence of anything to show the contrary, the admission of the record imported the making of the preliminary findings required by § 78. [170]

There was no error at a criminal trial in the denial of requests for instructions which were erroneous in law or based on inaccurate statements of the evidence, or which, though correct, were adequately covered in the judge's accurate and complete charge. [170–171]

A certain resolution by the Massachusetts Parking Authority as a matter of law governed the relationship between it and its "construction fund trustee," but, at the trial of indictments against one of the members of the Authority for larceny and conspiracy to commit larceny from it, an instruction to the jury that such relationship was a "question of fact" could only have benefited the defendant and was not prejudicial. [171]

There was no error at the trial of an indictment for larceny in denying the defendant's motion to compel the Commonwealth to elect a theory of the manner in which the alleged larceny was committed. [171]

There was no merit in a contention by the defendant in a criminal case that the "combined effect" of errors prejudiced him and deprived him of his constitutional right to a fair trial. [172]

INDICTMENTS found and returned on May 31, 1962.

Motions to dismiss the indictments were heard in the Superior Court by *Donahue, J.,* and by *Quirico, J.*; a plea in abatement was heard by *Donahue, J.*; the indictments were tried before *Quirico, J.*

*Monroe L. Inker* for Joseph W. Monahan, Jr.

*Gael Mahony,* Special Assistant Attorney General (*William B. Dockser,* Special Assistant Attorney General, with him), for the Commonwealth.

*John D. O'Reilly, Jr., & Matthew L. McGrath, Jr.,* for Francis W. Kiernan, submitted a brief.

SPIEGEL, J. The defendants Francis W. Kiernan (Kiernan) and Joseph W. Monahan, Jr. (Monahan) were convicted on indictments charging them with larceny from the Massachusetts Parking Authority (Authority) and with conspiracy to commit such larceny. The cases were tried under the provisions of G. L. c. 278, §§ 33A–33G, as amended, and are here on appeals and assignments of error by Monahan, and by report under G. L. c. 278, § 30, as to Kiernan.

1. The only question raised by the report is whether the evidence was sufficient to warrant submission of the case to the jury. The same question is raised by Monahan's sixty-fifth assignment of error regarding the denial of the motion for directed verdicts. Our consideration of the question requires that we set out the pertinent evidence.

By St. 1958, c. 606, the Authority was created as an in-

dependent body the essential functions of which were to build, operate and maintain a garage for motor vehicles under Boston Common. It was granted the general powers necessary to accomplish its purposes, including the powers to "issue Common garage revenue bonds of the Authority," to "make and enter into all contracts . . . necessary or incidental to the performance of its duties," and to "employ consulting engineers." St. 1958, c. 606, § 5 (f), (l) and (m). Under § 8 of the act the Authority was authorized "to provide by resolution . . . for the issuance of Common garage revenue bonds of the Authority for the purpose of paying . . . the cost of the project," the proceeds of which "shall be used solely for the payment of the cost of the project and shall be disbursed in such manner and under such restrictions, if any, as the Authority may provide in the resolution authorizing the issuance of such bonds or in the trust agreement hereinafter mentioned securing the same." The Authority could in its discretion, under § 9 of the act, secure the bonds by a trust agreement with a corporate trustee with such provisions "as the Authority may deem reasonable and proper for the security of the bondholders."

During a period of several years prior to Monahan's appointment to the Authority in 1959, Monahan and Kiernan "had a close association." They referred business to each other whenever they had the opportunity to do so. In 1957 or 1958, Kiernan formed a partnership for the purpose of performing architectural work. At Kiernan's suggestion, the partnership hired Monahan to promote architectural business for it, and, from November, 1959, to May, 1961, while Monahan was a member of the Authority, the partnership paid Monahan about $11,600. In 1958 Kiernan had also become associated with Muzzillo and Tizian.[1]   Late in

---

[1] Prior to July 1, 1960, there was a partnership in New York City under the name of Muzzillo & Tizian Associates, of which one Tizian was a partner. On July 1, 1960, Muzzillo resigned from this partnership, and the business became a corporation under the name Tizian Associates, Inc.   Prior to July 1, 1960, there was a sole proprietorship, owned by Tizian, in Connecticut, under the name Muzzillo & Tizian. After July 1, 1960, this business continued as a sole proprietorship, but the name was changed to Tizian Associates. We use the name Muzzillo & Tizian in reference to the partnership, the corporation and the sole proprietorship.

1959, Kiernan told Tizian that an underground garage was
"being contemplated," that "it would be a sizable project,
and that he felt . . . [Muzzillo and Tizian] had a good
chance of getting it." Approximately in the middle of
February, 1960, Kiernan told Monahan that he (Kiernan)
"would like to do some work on the Boston Common Un-
derground Garage."

On February 23, 1960, the Authority met and adopted a
series of resolutions, signed by Monahan and the other
members of the Authority. One of them, the bond resolu-
tion, created a special trust fund that was to be "deposited
with and held by the Construction Fund Trustee," desig-
nated to be The First National Bank of Boston (First Na-
tional), and to be "held in trust and applied only for the
payment of the cost of the Project." First National un-
der this resolution could make payments only upon the fil-
ing by the Authority of "(A) a requisition, signed by an
authorized Officer of the Authority, stating in respect to
each payment to be made: (1) the item number of the
payment; (2) the name of the person to whom payment
. . . [was] to be made; (3) the amount to be paid; (4) the
purpose, by general classification, for which the payment
. . . [was] to be made; (5) that obligations in the stated
amounts . . . [had] been incurred by the Authority, and
that each item thereof . . . [was] a proper charge against
moneys in the Construction Fund . . ." and "(C) . . . a
certificate, signed by the Construction Engineer and at-
tached to such requisition, certifying their approval thereof
and further certifying that each such obligation . . . [had]
been properly incurred and . . . [was] due and unpaid and
that, in so far as such obligation was incurred for work
. . . such work was actually performed . . . in furtherance
of the construction of the Project . . . . Upon receipt of
each such requisition and all required accompanying cer-
tificates, . . . [First National] shall pay each such item
from the Construction Fund directly to the person entitled
thereto."

The resolution also delineated the duties of the construc-
tion engineer, who would be retained by the Authority dur-

ing the time required for the planning and construction of the underground garage. These duties included the approval and certification of requisitions; the preparation of progress reports; the approval of plans, specifications and construction contracts; and the supervision of the construction of the garage. A third resolution provided that Muzzillo and Tizian be designated construction engineer. On the same date, Kiernan (purportedly acting for Muzzillo and Tizian) and the members of the Authority, including Monahan, signed a contract which provided that Muzzillo and Tizian would perform the duties of construction engineer for $12,500 a year. The Authority also adopted a resolution authorizing and approving a contract with The Foundation Company for the construction of the garage at the price of $7,500,000. The contract attached to this resolution bore Kiernan's signature following the words "Within contract hereby approved, Muzzillo and Tizian."

On March 25, 1960, and on April 19, 1960, Tizian sent letters to Kiernan, stating that he (Tizian) had not yet seen the contract of February 23 between the Authority and Muzzillo and Tizian and that he would like to see it. By checks dated April 18, 1960, and May 13, 1960, Kiernan received $20,828 from the Authority's construction fund, and deposited the amounts in his personal account at the Everett National Bank. These transactions were unknown to Tizian. In May or June, 1960, Kiernan finally showed a copy of the February 23 contract to Tizian, who objected to it on a number of grounds, two of which were that the contract was "backdated" to February 23 and that Kiernan was unauthorized to sign it as a partner.

In August, 1960, stationery with a Muzzillo and Tizian letterhead thereon was printed for Kiernan. Sometime thereafter he arranged for a letter addressed to the Authority to be typed on this stationery, dated February 15, 1960, containing a proposal for review of plans and specifications prior to construction for a total payment of $12,500.

In the fall of 1960, Kiernan told Tizian that the contract relating to the construction engineer had been awarded to another firm.  As far as Tizian knew, the relationship between the Authority and Muzzillo and Tizian ended at this point.  By this time, Kiernan had received a total of $93,188 from the Authority, none of which was paid over to Muzzillo and Tizian.  He asked Tizian to destroy the copy of the February 23 contract with the Authority, but Tizian refused to do so.

In December, 1960, stationery with a Muzzillo and Tizian letterhead thereon was again printed for Kiernan.[2]  Some-time thereafter, he arranged for another letter, dated March 28, 1960, to be typed on this stationery, stating a proposal which was identical with the terms of a contract between the Authority and Muzzillo and Tizian also dated March 28, 1960, and signed by Kiernan and Monahan, to the effect that Muzzillo and Tizian would perform the services of construction engineer for a price equal to $4\frac{1}{2}\%$ of the total construction cost.  If the $7,500,000 contract price for construction were not increased by extras or by a bonus, the minimum payment to the construction engineer under the $4\frac{1}{2}\%$ contract would be $337,500.  The Authority's minutes of its meeting of March 28, 1960, show that all of the members, including Monahan, voted to approve the $4\frac{1}{2}\%$ contract, and both Kiernan and Monahan testified that it was authentic and was approved by the Authority on March 28, as the minutes recite.   However, Tizian never saw the contract before March, 1962; and during the semi-annual (June 30 and December 31) audits of the Authority's books, the Authority's accountant never saw the $4\frac{1}{2}\%$ contract or any reference thereto in the minutes of any of the Authority's meetings.  Furthermore, at a meeting of the Authority on July 10, 1961, attended by both Kiernan and Monahan, a budget estimate was read indicating that the total amount to be paid under the construction engi-

[2] The letterheads list San Juan, Puerto Rico, as one of the locations of the Muzzillo & Tizian office; but the Puerto Rican office was not opened until June, 1960.

neer's contracts was $250,000.[8]  Nevertheless, on December 31, 1961, the accountant in his financial report to the Authority stated that the construction engineer had been credited $346,756, a figure which represented the amounts which had been paid to the construction engineer plus the amount on a list of payables confirmed and sent to the accountant by Kiernan.  It was not based on a computation by the accountant of 4½% of the construction cost, which would have resulted in a figure of $345,717.  On January 29, 1962, the Authority, including Monahan, approved the report.  On February 27, 1962, Kiernan told Tizian's secretary that the construction engineer's contract was for his own benefit, and that he received approximately $378,000 in checks "in the name of Muzzillo & Tizian" and cashed them for himself.

A substantial portion of the construction engineer's duties as delineated in the Authority's bond resolution of February 23, 1960 (see *supra*), were not performed by Kiernan or by anyone else.  Although Kiernan and his secretary spent considerable time at the Authority's office, Kiernan did not hire any engineers or other employees to work there and did not have any engineering equipment there.  No work was done with respect to the garage at Kiernan's architectural partnership.  Nor was any work performed on the garage by Muzzillo & Tizian.  From March, 1960, through February, 1962, during the period of construction and more than three months thereafter, Kiernan appeared at the construction site on only fourteen days.  He never inspected concrete forms, reinforcing rods, or the driving of piles.  He was never present while the plumbing was installed or during tests conducted therewith.  During

---

[8] The estimated budget covered the period from July 1, 1961, to the date of the completion of construction, which was then expected to be September 30, 1961.  The budget showed $15,032 as the amount to become due to the construction engineer at the completion of construction.  Since the amount paid to the construction engineer prior to the period covered by the budget was $234,968, the total amount paid and the amount to become due equal $250,000.

On September 13, 1961, Kiernan dictated to his secretary a contract, ostensibly between Muzzillo & Tizian and the Authority, providing for payment to the construction engineer of an amount equal to 4% of the construction price, plus $12,500 for work done prior to the start of construction.  Based on the construction contract price of $7,500,000 the total payment would be $312,500.

two ten-day periods which he spent respectively in the Virgin Islands and in North Carolina and Ireland, concrete was being poured in large quantities at the construction site.[4]

During the period involved in this case, Kiernan submitted twenty-five invoices to the Authority on sheets bearing the letterhead of Muzzillo & Tizian. However, Muzzillo and Tizian had nothing to do with the preparation of any of these invoices. At meetings of the Authority, Monahan voted to approve payment of each invoice. Corresponding requisitions of the Authority for payments to the construction engineer were certified by Kiernan and, on three occasions, were signed by Monahan. These requisitions were sent to First National for the issuance of checks drawn to the order of Muzzillo & Tizian. Each of the issued checks was charged to the Authority's construction fund in the custody of First National, and corresponds to one of the counts in the present indictment. Muzzillo & Tizian never received the proceeds of any of the checks, which Kiernan deposited in his own bank accounts.

There were contradictions between certain invoices submitted for supervisory work by Kiernan and their related requisitions on the one hand, and the actual progress of planning and construction on the other. A requisition dated April 15, 1960, contained an item for payment to the construction engineer of $11,146 for "Supervision, plan review, consultations & drafting." However, the only plans in existence on that date were preliminary architectural drawings which had been completed in 1959 and with which Kiernan had had no connection. An invoice from Kiernan for $23,160, dated June 6, 1960, purported to be submitted relative to "Completion of structural plans. Completion of entrance details. Review of electrical contract." How-

---

[4] On April 19, 1960, Kiernan hired one Tomasello "to check all the equipment, personnel, and to watch things as they were going along and to report to . . . [Kiernan] immediately anything unusual." After November, 1960, Tomasello appeared at the construction site only part time, and left the job early in January, 1961, before work on the construction of the walls, the middle and upper level slabs and the roof had begun. Tomasello was not a registered professional engineer. See G. L. c. 112, §§ 81J and 81T, as amended by St. 1958, c. 584, §§ 4 and 10. See also pp. 165–166, infra.

ever, the structural plans and the entrance details were not complete until August 8, 1960, and the electrical contract was not entered into until October 31, 1960. Another invoice dated June 27, 1960, for $14,800, recites ''Final structural drawings,'' among other items, as a basis for payment. However, these drawings were then only 48% complete. His invoice for $10,150, dated November 7, 1960, recites ''Completion of slab and final approval of drawings,'' although the first slab poured was not complete until March 10, 1961. The invoice of November 28, 1960, for $12,200, recites ''Completion of slab and piling,'' even though the piling was not complete until July 19, 1961. Similarly, the invoice dated June 5, 1961, contains an item of $8,000 for ''½ Completion of roof,'' but the roof was then less than one quarter complete.

On seven occasions, between June 14, 1960, and January 15, 1962, Kiernan made payments to Monahan which totaled $12,300. These payments were made by check and varied in amount from $750 to $3,000. Four of these checks were drawn on an account at the Everett National Bank in which Kiernan had deposited money received from the Authority. Another check was drawn on Kiernan's account at the New England Merchants National Bank. The sixth and seventh checks were drawn on his account in the Citizens Bank & Trust Company of Peabody. Five of the checks were payable to Monahan. The proceeds of the other two checks, which were drawn to cash, also went to him. Monahan's explanations of these transactions were contradictory.

''To constitute the crime of larceny by false pretenses, 'it must appear that there was a false statement of fact known or believed by the defendant to be false, made with the intent that the person to whom it was made should rely upon its truth, and that such person did rely upon it as true and parted with personal property as a result of such reliance.' '' *Commonwealth* v. *Kiernan,* 348 Mass. 29, 46, and cases therein cited. The evidence shows a scheme on the part of Kiernan to represent that Muzzillo & Tizian had entered into an agreement with the Authority to act as

construction engineer, and that Kiernan was the authorized agent of Muzzillo & Tizian in that connection. The jury could find that, contrary to his representations, Kiernan alone intended to reap the benefits of such an agreement, and that, during the period here involved, he made several attempts to conceal his scheme by composing a number of false letters and documents to lend an illusion of authenticity to his relationship with the Authority. The evidence indicates that Kiernan carried through his illicit arrangements by submitting to the Authority a series of invoices which falsely represented that certain work had been done by Muzzillo & Tizian, or by Kiernan on its behalf, in the role of construction engineer. The statements in the invoices did not correspond to the progress of the construction which was supposed to have been supervised and inspected by the construction engineer, and Kiernan seldom appeared at the construction site to perform the duties of inspection or supervision. The jury could therefore conclude that Kiernan did not perform the work of construction engineer and that no one else did so. The jury could also infer from all of the relevant circumstances that Kiernan knew and intended that the Authority would approve payment of each of the spurious invoices and file the corresponding requisitions. It is evident that Kiernan made false statements of fact in certifying these requisitions and in thereby representing to First National that the obligations in the amounts of the invoices had been properly incurred for work which was actually performed in furtherance of the construction. Under the bond resolution, First National could disburse funds on no other basis, and the jury could infer that Kiernan knew and intended that First National, upon presentation of the fraudulently certified requisitions, would issue checks charged to the Authority's construction fund. The evidence shows that the Authority did approve payment of Kiernan's false invoices and did file the corresponding requisitions which, as fraudulently certified by Kiernan, did cause First National to issue the checks. Thus the evidence supports Kiernan's conviction of larceny. G. L. c. 266, §§ 30, 34.

With regard to Monahan, the evidence shows that, as a member of the Authority, he approved and signed the contract of February 23, 1960, which provided that Muzzillo & Tizian would perform the duties of construction engineer for the price of $12,500 a year. A subsequent contract, dated March 28, 1960, provided that Muzzillo & Tizian would receive 4½% of the construction cost, or at least $337,500. This contract was signed by Monahan, who, according to the Authority's minutes of March 28, 1960, also voted to approve it. Although Monahan insisted that this contract was authentic, the jury were not required to believe him. They could believe instead the contradicting evidence that the Authority's accountant, in examining the Authority's books and minutes during the period here involved, never saw the 4½% contract or any reference thereto. On the basis of this and additional evidence that a letter from Kiernan proposing the terms of the 4½% contract could not have been written until, at the earliest, December, 1960,[5] the jury could infer that the 4½% contract of March 28, 1960, was not in existence until at least December, 1960, and that Monahan was a party to the backdating of the contract in order to clothe with apparent legitimacy the increased payments to the construction engineer. On this basis, the jury could also infer that there was nothing to justify the payments to Kiernan in excess of $93,000 during the summer and fall of 1960 since the only existing contract with the construction engineer during that period provided for a *total* payment of only $12,500 a year. Yet Monahan during that period voted to approve each of the payments to Kiernan on the basis of the invoices which far exceeded the total existing contract price. In this light and in view of other evidence that Kiernan and Monahan were close associates; that Kiernan had approached Monahan regarding the construction engineer's contract; that Kiernan's firm paid $11,600 to Monahan while the latter was a member of the Authority; and that Kiernan on seven occasions during the period here involved paid Monahan

[5] See p. 147, *supra*.

$12,300 in checks, support an inference that Monahan was a party to Kiernan's illicit scheme to extract moneys from the Authority's construction fund and that Monahan knew that the invoices which Kiernan submitted to the Authority were fraudulent and were a means of perpetrating the scheme. In further support of this inference the jury could consider that Monahan at first denied receiving any money from Kiernan but later testified in court that the $12,300 in checks represented loans from Kiernan. The jury were not compelled to believe that the checks represented loans; and Monahan's initial denial in view of his subsequent, inconsistent testimony was evidence of consciousness of guilt. *Commonwealth* v. *DiStasio*, 297 Mass. 347, 360. *Commonwealth* v. *Swartz*, 343 Mass. 709, 713.

The jury could conclude from all of the relevant circumstances that at the time Monahan approved payments of the spurious invoices and when he signed three requisitions for such payments, he knew that the work of construction engineer had not been performed and that Kiernan did not intend to perform it. These transactions could thus be found to have involved false statements of fact by Monahan, in approving the payments and signing three requisitions, that the obligations in the amounts stated therein had been incurred by the Authority, and that each item thereof was a proper charge against the construction fund. It could also be found that Monahan knew these statements were false, and that he made them with the intent that First National would rely upon the resulting requisitions by issuing checks charged to the Authority's construction fund. These requisitions were filed and did cause First National to issue the checks. The evidence thus supports Monahan's conviction of larceny. See *Commonwealth* v. *Kiernan*, 348 Mass. 29, 46; G. L. c. 266, §§ 30, 34.

There is also sufficient evidence to support the convictions of conspiracy to commit larceny. "The settled principles which are determinative of conspiracy as a common law crime are set out in the cases cited and discussed in *Commonwealth* v. *Beal*, 314 Mass. 210, 221–222, and need

not be repeated.    Contrary to the contention of the defendants that the evidence . . . [is] insufficient to convict, there . . . [is] ample evidence, already recounted, that there was 'a combination of two or more persons [who], by some concerted action, [sought] to accomplish some criminal or unlawful purpose . . . .'    *Commonwealth* v. *Hunt,* 4 Met. 111, 123.    See *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 493." *Commonwealth* v. *Kiernan,* 348 Mass. 29, 55.    The jury could find concerted action from, inter alia, the evidence of efforts to give an appearance of legitimacy to the payments to Kiernan through the spurious contract signed by both defendants; from evidence showing Kiernan's dependence on Monahan's approvals of payments and authorizations of three requisitions in order to acquire the checks from First National; and from evidence of Monahan's consciousness of guilt relative to his explanation of payments to him from Kiernan.    The jury could conclude that Kiernan and Monahan, in their respective roles, directed their efforts to the common object of unlawfully procuring money from the Authority's construction fund.    There was no error in denying the motion for directed verdicts.

2.    The fifty-second assignment of error relates to the admission against Monahan of evidence which had previously been limited to the other defendants.[6]    As we have already shown, "sufficient evidence had been adduced to support . . . [an] inference that a conspiracy existed; and . . . the state of the evidence was such that the jury could find that . . . the defendants had joined in . . . [a] conspiracy with the result that evidence of the acts, knowledge and admissions of . . . [each of them] became evidence against . . . [both of them]."    *Commonwealth* v. *Kiernan,* 348 Mass. 29, 58.    *Commonwealth* v. *Greenberg,* 339 Mass. 557, 577.    There was no error.

3.    Monahan's fifth and eighth assignments of error challenge the denial of his motions to dismiss the indictments on the ground that the grand jury were prejudiced by ad-

---

[6] The cases were tried together with that of another defendant (Carp) who was acquitted.

verse publicity prior to the return of the indictments. The motions were accompanied by affidavits containing statements as to the nature of this publicity via newspaper, radio and television, and also containing examples of newspaper headlines in this regard. The judge read newspaper clippings which were shown to him apparently in support of the motions, and found that there was nothing in them which was "inflammatory" as against Monahan. These clippings were admitted as exhibits. Monahan contends that the judgments should be reversed because the trial judge erred "by refusing to . . . dismiss the indictments on the ground that the grand jury . . . was . . . prejudiced, and . . . by denying the defendant the opportunity to prove as a matter of fact that the grand jury was . . . prejudiced; and that state law-enforcement officials and other state officials had issued, caused and stimulated the prejudicial publicity with the intention to prejudice the grand jury." This contention depends in part on Monahan's third and fourth assignments of error. The third assignment relates to the judge's ruling that the news releases and stories, copies of which were submitted in support of the motions to dismiss, were not inflammatory. The defendant contends that the judge should not have made this ruling "in the absence of any interrogation of the grand jurors" to determine the prejudicial effect of the releases and stories. A motion to examine the grand jurors for this purpose was filed, but we note that no exception was specifically directed to the denial of that motion. The fourth assignment concerns the denial of the motion to interrogate Assistant Attorney General DeGiacomo as to whether he issued press releases and made the statements attributed to him by the news media relative to this case. An exception to the denial of this motion was duly taken.

There was no error in the denial of the motions to dismiss the indictments on the ground that prejudicial publicity had rendered the grand jury biased against Monahan. In *Commonwealth* v. *Woodward*, 157 Mass. 516, 518–519, we said: "It is always considered that in finding indictments grand jurors may act upon their own knowledge, or upon the

knowledge of one or more of their number.  It is accordingly held in most jurisdictions that it is no objection to the
validity of an indictment, that one or more of the grand
jurors, who were otherwise qualified, had formed or expressed an opinion of the guilt of the accused. . . .  The
indictment is merely an accusation or charge of crime. . . .
It is not . . . necessary that each grand juror . . . be free
from bias or prejudice, provided he has the general qualifications which are required.  Such a test is not implied
either from the terms of his oath[7] or from the nature of his
duties.  If such an inquiry were open, the delays and complexity of criminal trials would be greatly increased, and no
correspondingly useful purpose would be served.''  To the
same effect is *Commonwealth* v. *Geagan,* 339 Mass. 487,
498–499.  See *Commonwealth* v. *Kiernan,* 348 Mass. 29,
33.  Hence, there is no basis for Monahan's motions to
examine the grand jurors and Assistant Attorney General
DeGiacomo.  These motions were properly denied, as were
the motions to dismiss the indictments.  *Beck* v. *Washington,* 369 U. S. 541, 546, does not require a contrary result.
See comment, 111 U. of Pa. L. Rev. 1000 (1963).

4.  In his sixty-ninth assignment Monahan claims error
in the judge's denial of his motion that the judge propound
questions prepared by counsel to determine whether the
prospective petit jurors were impartial.  However, ''[i]t
is clear from our decisions that the questioning of jurors,
other than as required by G. L. c. 234, § 28, rests wholly in
the discretion of the judge.  *Commonwealth* v. *Taylor,* 327
Mass. 641, 646–647.  *Commonwealth* v. *Bonomi,* 335 Mass.
327, 333–335.  *Commonwealth* v. *Greenberg,* 339 Mass. 557,
566.''  *Commonwealth* v. *Kiernan,* 348 Mass. 29, 35–36.
Section 28 states that ''[u]pon motion of either party, the
court shall, or the parties or their attorneys may under the

---

[7] G. L. c. 277, § 5:  ''You, as grand jurors . . . do solemnly swear that you
will diligently inquire, and true presentment make, of all such matters and
things as shall be given you in charge; the commonwealth's counsel, your
fellows' and your own, you shall keep secret; you shall present no man for
envy, hatred or malice, neither shall you leave any man unpresented for love,
fear, favor, affection or hope of reward; but you shall present things truly,
as they come to your knowledge, according to the best of your understanding;
so help you God.''

direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead." Monahan does not contend that any particular juror was biased, or that there was such adverse publicity that any juror selected in Suffolk County at the time he was tried must be held to be presumptively biased. His position is only that, since the "massive publicity" linked him to the alleged crime, "it constitutes an abuse of discretion . . . not to conduct a voir-dire examination which extends beyond the basic four questions" of § 28. We find nothing in our cases, in *Irvin* v. *Dowd, Warden,* 366 U. S. 717, or in *Beck* v. *Washington,* 369 U. S. 541, to sustain such a proposition. There was no error. *Commonwealth* v. *Geagan,* 339 Mass. 487, 504.

5. Before trial, Monahan filed a plea in abatement, with supporting affidavits, alleging that "unauthorized persons, not required or permitted by law to attend sessions of the grand jury were present before the grand jury during the investigation [and consideration] of the allegations of the indictments." The judge held a hearing on the plea and received testimony. He denied motions to empanel a jury to determine facts relative to the question presented by the plea, ruled "that the persons named in the affidavits . . . were . . . authorized by law to be present in the Grand Jury room," and overruled the plea. Monahan excepted to the denial of his motions to empanel a jury on the plea, and to the overruling of the plea, and, by his sixth assignment of error, asserts that the judge was "without jurisdiction to rule on the plea."

The presence of unauthorized persons before a grand jury is properly a matter in abatement. *Lebowitch, petitioner,* 235 Mass. 357, 362. *Commonwealth* v. *Geagan,* 339 Mass. 487, 495–496. Monahan, in his brief, appears to be

concerned solely with the presence of a State police officer
in the grand jury room.  At the hearing before the judge,
there was no evidence that this officer was in the grand jury
room while any grand jury sessions were in progress.  The
judge did not resolve the issue presented by the plea as one
of fact.  After each of Monahan's requests to empanel a
jury on the issue, the judge said, "I don't think there is
any issue of fact for a jury so far," and "No question of
fact for a jury so far."  Under G. L. c. 277, § 74, "[t]he
court may refuse to receive a plea in abatement or other
dilatory plea to an indictment until its truth has been
proved by affidavit or other evidence."  There was no er-
ror.  *Commonwealth* v. *Geagan,* 339 Mass. 487, 496–497.

6.  By his ninth and sixty-eighth assignments of error,
Monahan challenges the empanelling of the petit jury.  On
June 3, 1963, the trial judge filed a certificate of protracted
trial pursuant to G. L. c. 234, § 26B, whereby he "may or-
der impanelled a jury of not exceeding fourteen members."
After such a jury were empanelled and sworn and before
the indictments were read to them, the judge excused the
tenth juror and, over Monahan's objection, ordered that an
additional juror be drawn and empanelled; and an excep-
tion was noted.  In this connection, Monahan again ex-
cepted, after the verdicts were rendered, to the judge's
denial of the motion in arrest of judgment and to set aside
the verdicts.  There is no objection to the grounds for ex-
cusing the tenth juror or to the qualifications of the addi-
tional juror or to the lack of an opportunity for peremptory
challenge.[8]  It is Monahan's contention that the judge ex-
ceeded the "legislative limitations" on his jurisdiction un-
der G. L. c. 234, § 26B, by ordering another juror empan-

---

[8] Monahan's brief contains the following assertion: "The action of the
trial . . . [judge] in ordering another juror impanelled and sworn denied due
process of law to the defendant, *inter alia,* on the ground that under these cir-
cumstances there was no legislative consideration of whether . . . the right
of peremptory challenge should be extended."

Despite the obscurity of the foregoing statement it might well be erroneous
because there is no basis for concluding that the Legislature did not consider
this matter.  See G. L. c. 234, § 29 (a defendant is entitled to three per-
emptory challenges in criminal cases not involving crimes punishable by death
or life imprisonment, but there is no provision in such cases for peremptory
challenge of additional jurors empanelled under § 26B).

elled after the maximum permissible number of jurors had already been sworn to try the case.

Section 26B states that "in a criminal case . . . to be tried with a jury in the superior court which in the opinion of the court is likely to be protracted, the court may so certify and may order impanelled a jury of not exceeding fourteen members and the court shall have jurisdiction to try the case with such jury subject to the following provisions of this section. If at the time of the final submission of the case by the court to the jury more than twelve members of the jury who have heard the whole case are alive and not incapacitated or disqualified, the court shall direct the clerk to place the names of all of the remaining jurors, except the foreman, in a box and draw the names of a sufficient number to reduce the jury to twelve members, and the court shall thereupon discharge the jurors whose names are so drawn, and the court shall have jurisdiction to receive the verdict of the twelve remaining members of the jury whose names have not been so drawn and shall have jurisdiction to render judgment in said case." There is nothing in this section which operates to prohibit the judge's challenged action in the case at bar. In a practical sense, Monahan's argument, that the "effect of the order and procedure adopted by the trial . . . [judge] was to cause the impanelling of fifteen jurors to try the issue," is specious. There were never more than fourteen jurors empanelled at any one time. In *Commonwealth* v. *Galvin*, 323 Mass. 205, 213–214, we said that "the right of the judge to excuse a juror for cause and to provide for the selection of another in his place continues at least until the jury is empanelled." No persuasive considerations appear to preclude the exercise of this power even after the jury are empanelled but before the trial actually begins. "Section 26B was obviously enacted to avoid the difficulty which has occasionally arisen when during the course of a long and expensive trial a juror dies or becomes incapacitated and an entire new trial becomes necessary." *Commonwealth* v. *Bellino*, 320 Mass. 635, 642. This purpose would be defeated if the judge could not avert the depletion of the statutory reserve of

two jurors before the "protracted trial" even commences. He did avert it here, after one of the jurors was excused, by ordering that another juror be drawn and empanelled before the indictments were read. It is not contended that Monahan was harmed or prejudiced by this procedure, and we are unable to discern any harm or prejudice therefrom. *People* v. *Hess,* 107 Cal. App. 2d 407, 424–425. We also find no violation in this regard of any provision of the State or Federal Constitutions.

7. By his tenth assignment Monahan claims error in permitting the Commonwealth to put certain questions to its witness, the secretary-treasurer of the Authority. On the two occasions involved, the witness was asked when she first saw certain documents and when, according to her personal knowledge, they were received by the Authority. The witness, referring repeatedly to the contents of the Authority's minutes, was not responsive. Over Monahan's objections, the Commonwealth was permitted to repeat the original questions or variations thereof and to insist on a responsive answer. Contrary to Monahan's contention, there was no abuse of discretion in permitting the examination.[9]

---

[9] At one point, the examination had reached such an impasse because of the recalcitrance of the witness that the judge began the following colloquy:

THE JUDGE: "Mrs. Arena, can you say Yes or No, that you did or did not see that document in March of 1960? Do you have a memory of it?" THE WITNESS: "I remember a contract was signed, Judge, but I am going to rely on my minutes. If the minutes say it was this contract, this is what I am going to stick by. I am not going to say anything else. I am going to stick by my minutes." THE JUDGE: "You have no recollection without referring to your minutes, is that what you say?" THE WITNESS: "No. I am saying that if my minutes say that the contract was entered into March 28, 1960, that is the contract." THE JUDGE: "I will repeat. Without looking at your minutes, can you tell this jury that you did or did not see this document in the month of March, of 1960?" THE WITNESS: "I had to. I assented to their signatures." THE JUDGE: "Well, now, will you say Yes or No, whether you did or did not see that document in the month of March, 1960." THE WITNESS: "I am going to answer the same way." THE JUDGE: "You haven't answered the question. You say you had to, and you say you will rely on your minutes, and you say you will rely on your records. Do you have a memory? You are not compelled to say that you remember something you don't remember. Do you remember seeing that document in the month of March, 1960? Can you say Yes or No, that you did or did not?" THE WITNESS: "I had to have seen it in the month of March, 1960." THE JUDGE: "When you say you had to, do you mean that you did." THE WITNESS: "Of course; it is right here. It says March 28, 1960. I signed it." THE JUDGE: "Is your answer Yes, that you saw it in the month of March, 1960?" THE WITNESS: "Yes, I saw this on March 28, 1960, the day of the meeting."

8. Error is claimed (assignments 24 and 27) regarding certain questions posed to the Authority's accountant, during direct examination by the Commonwealth, as to the identity of persons with whom he "probably" spoke in connection with his preparation of a budget estimate. It is contended that the questions were "improper in form and designed to elicit answers based upon conjecture and surmise." However, it had already been established by the witness that conversations concerning the budget estimate did occur and that certain people were ordinarily involved in such matters. Therefore, it would not be mere surmise on the part of the witness to relate these people to the conversations when he testified in answer to questions in which the word "probably" was used. In addition, subsequent questions, to which no objections were made, elicited answers which indicated that the prior testimony given in response to the questions here assigned as error was not based on probabilities. Finally, in view of a great deal of other evidence which the jury could have considered, the examination here called into question was a relatively minor aspect of the Commonwealth's case. Consequently, we are unable to perceive prejudicial error.

9. In his twenty-eighth assignment, Monahan contends that it was error to allow a series of questions to be posed to the Authority's accountant regarding whether he had seen any reference in the minutes of the Authority's meetings to the 4½% contract between the Authority and Muzzillo & Tizian during audits conducted by the witness. Monahan asserts that there was no showing "that the witness had any reason to look in the minutes for a reference to the aforementioned contract." However, prior to the examination the witness several times testified that he or "someone on . . . [his] staff" examined the minutes in the course of the 1960 audits. Furthermore, it could be inferred from the evidence of the occurrence of the audits that the accountant would scrutinize all debts and financial commitments, including contracts. To this extent, a sufficient foundation for the Commonwealth's questions about

the 4½% contract was established. It was not established at this time that the witness had himself examined the minutes, and on this basis there might have been technical error in permitting further questions on the 4½% contract. However, as the following excerpt from the transcript shows, later examination of the witness tended to supply the necessary information: COUNSEL FOR THE COMMONWEALTH: "Did you say in reply to questions by Mr. Inker this morning that to the best of your memory you were the only person who was present at the Parking Authority in the summer of 1960 during the audit performed at that time?" THE WITNESS: "Yes. Q. During the course of the audit that was performed during the summer of 1960 was an examination made of the minutes for the first six months of 1960? A. Yes. Q. Was that examination made by you? A. I don't recall. It must have been, yes. Q. Well, was anybody else with you to the best of your memory? A. I have no memory of it. Q. Didn't you tell us a moment ago that you have no memory of anybody else with you on that occasion? A. Yes. . . . Q. Well, now, isn't it your memory now, Mr. Morse, that the examination of the minutes for the first six months of 1960 that was made during the summer of 1960 was made by you? . . . A. If I was the only one there, it would have to be, yes." In view of this later testimony, if there was any error in previously allowing the questions on whether the witness had seen the 4½% contract in the minutes, it was harmless error.

Monahan excepted to the refusal to strike the last question of the examination quoted above, and, in his twenty-ninth assignment, contends that it was leading. At a prior conference in the lobby, the judge found that the witness was hostile, and consequently permitted "more leeway in examination," depending "on the question as asked." Monahan's twenty-sixth assignment challenges the finding of hostility. Rulings on whether a witness is hostile and whether cross-examination of the witness by his proponent should therefore be permitted are within the discretion of

Commonwealth *v.* Monahan.

the trial judge. *Commonwealth* v. *Coshnear,* 289 Mass. 516, 527. There was no abuse of discretion. *Commonwealth* v. *Jones,* 319 Mass. 228, 230. *Commonwealth* v. *Hartford,* 346 Mass. 482, 487.

10. Monahan assigns as error (assignment 34) that the Commonwealth was permitted to introduce evidence of a telephone conversation "without first establishing that a telephone conversation had in fact taken place between the parties." In the course of direct examination of Tizian by the Commonwealth the following colloquy occurred: "Q. Now at some later time, did you have further discussion with Mr. Kiernan concerning the Under Common Garage in Boston? A. Well, I talked to him on the phone and —" COUNSEL FOR MONAHAN: "Objection." COUNSEL FOR CARP: "Just Yes or No, please. A. Yes. Q. Can you tell us approximately when this took place? A. Shortly thereafter. I was very interested in the project. Q. Now, tell us first where this second conversation took place? A. The second conversation that I recall was at a cocktail party. Q. Before the cocktail party, you had some conversation with Mr. Kiernan? A. Yes. Q. Did the telephone conversation have anything to do with the Under Common Garage?" The basis for the assignment of error is Monahan's exception to the overruling of his objection to this last question. However, in view of the preceding testimony, the related issues discussed in *Commonwealth* v. *Harris,* 232 Mass. 588, 591, *Bond Pharmacy, Inc.* v. *Cambridge,* 338 Mass. 488, 490–491, and *Commonwealth* v. *Hartford,* 346 Mass. 482, 487–488, are not here validly raised. There was no error.

11. During cross-examination of Tizian, he was asked certain questions in attempts to elicit evidence concerning various financial arrangements between Kiernan and Tizian in matters other than the Boston Common Garage, and concerning various aspects of their partnership. The exclusion of these questions is assigned as error (assignments 37 through 42). The only relevant evidence of a relationship between Kiernan and Tizian would have been in connection

with the construction of the garage. The rule that, with a few exceptions, all evidence which can throw light on the disputed transaction should be admitted, does not apply to the excluded questions, which the trial judge apparently considered irrelevant. Compare *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279. The questions were properly excluded.

12. Monahan assigns as error (assignment 48) the refusal to strike from the evidence a witness's transcription of her stenographic notes dictated to her by Kiernan on September 13, 1961. The transcription sets forth the terms of a contract wherein Muzzillo & Tizian would perform the duties of construction engineer for a total payment of $312,500. In view of the date of the dictation, and since other evidence shows that Kiernan by this time had received large sums of money from the Authority's construction fund, this evidence was admissible to show an attempt to conceal the larceny from the Authority's construction fund. There was evidence that the witness transcribed her notes in June, 1962, typing out the date on the transcription as September 13, 1962. Monahan's grounds for his assignment are that the witness testified that she was not sure of the "accuracy of her notes" and that she changed the date on the transcription to September 13, 1961, at the suggestion of the assistant attorney general. The witness was subjected to a rather vigorous cross-examination relating to the accuracy of her notes. In response to the following question: "And you are not quite sure about the accuracy of your notes now, are you?" the witness answered: "Not verbatim, no." There is no doubt that the witness made the notes and that she transcribed them. We do not think that because the witness was not certain that her notes were transcribed "verbatim" is sufficient reason for the exclusion of the transcription of her notes. Regarding the change of date, there is nothing to show that it was not the correction of an obviously typographical error. We are of opinion that the transcription was properly admitted.

13.   Monahan claims as error (assignment 49) that the Commonwealth was permitted to ask the owner of the printing company which printed certain stationery for Kiernan whether she observed anything unusual about the large capital T in the word Tizian on a letterhead signed by Kiernan.   The ground for the assignment is that the "question called for an opinion and the witness was not qualified as an expert."   The subject matter did not require "special knowledge beyond that possessed by the ordinary juryman" and, therefore did not necessarily call for expert testimony. *Lovasco* v. *Parkhurst Marine Ry.* 322 Mass. 64, 67.   Cf. *Toppin* v. *Buzzards Bay Gas Co.* 348 Mass. 397, 401.   The judge in his discretion could have so concluded.   There was no error.

A similar claim of error (assignment 51) is made regarding the examination of a witness who testified about his chemical analysis of the printing powders used in certain raised letterheads which were in evidence.   It is argued that the witness's qualifications as an expert were not established prior to his testimony.   However, it is clear from the record that the witness, practically at the beginning of his testimony, recited his experience and training in the field of chemistry.   "Generally it is within the discretion of the trial judge to determine whether to admit the testimony of an expert." *Consolini* v. *Commonwealth,* 346 Mass. 501, 503.   The trial judge did not abuse his discretion in concluding that the witness was qualified to give an expert opinion.

14.   By his fiftieth assignment of error, Monahan challenges the admission of testimony to the effect that Kiernan was not a registered professional engineer.   He argues "that G. L. c. 112, § 81R, specifically permits the use of the term 'professional engineer' and also provides that registration as a registered professional engineer shall not be a prerequisite to the practice of professional engineering." He thus contends that the evidence in question was "irrelevant and immaterial."   However, § 81R was amended, before the start of the transaction here involved, by St. 1958,

c. 584, § 9, which omits the permissive feature of the original section. In order to be registered, a professional engineer must possess the qualifications prescribed in G. L. c. 112, § 81J, as amended by St. 1958, c. 584, § 4. We note that under G. L. c. 112, § 81T, as amended by St. 1958, c. 584, § 10, "[w]hoever practices or offers to practice engineering . . . in the commonwealth without being registered in accordance with the provisions of this chapter . . . shall be punished by a fine of not less than one hundred nor more than five hundred dollars or by imprisonment in a jail or house of correction for a period of not exceeding three months, or both." We are of opinion that Kiernan's failure to register as a professional engineer is some evidence, which may be rebuttable, that he lacked the qualifications required by G. L. c. 112, § 81J, as amended, and that he did not intend to perform or was incapable of performing the duties of construction engineer in good faith.

15. By assignment 57, error is claimed in the exclusion of a question during direct examination of Monahan as to "what that conversation was" which Monahan had with Brady[10] concerning the work which Monahan was expected to do as a member of the Authority. The question appears to call for hearsay testimony but in any event it was inadmissible because it was irrelevant to the issues as we shall show in our discussion below of assignment 58.

By assignment 58, Monahan contends that the exclusion of the following two questions to him was error: "[W]hat was your understanding with respect to when a Muzzillo & Tizian bill would be presented to the Authority for payment?" and "What is your understanding with respect to payments to Muzzillo & Tizian for percentage of services rendered?" The corresponding offers of proof were as follows: "[H]e would testify that there was no fixed time for the presenting of bills by Muzzillo & Tizian to the . . . Authority and bills would be presented any time," and "[H]e would say that it was his understanding that the four and

---

[10] This refers to one George L. Brady, who was a member of the Authority.

a half per cent to be paid to Muzzillo & Tizian did not depend on any percentage of services rendered, that it was a four and a half per cent contract, depending on just the total job.'' The questions were irrelevant and were therefore properly excluded. Monahan's understanding in these matters has nothing to do with whether he knew that the bills were fraudulent to the extent that no work at all was intended to be done and that the bills were part of an illicit scheme to extract moneys by false pretences from the Authority's construction fund.

Assignments 59 through 62 refer to the Commonwealth's proferring a document to Monahan during the Commonwealth's cross-examination of him. The points raised are trivial and require no discussion.

16. Monahan by his forty-fifth assignment claims error in the admission in evidence of photostatic reproductions of checks payable to him, on the ground that there was no compliance with G. L. c. 233, §§ 77 and 78, as to preliminary findings prerequisite to the admission of such evidence. The applicable statute, however, is G. L. c. 233, § 79E, as amended through St. 1962, c. 90: ''If any business [or] institution . . . in the regular course of business or activity has kept or recorded any memorandum, writing entry, print, representation or combination thereof, of any act, transaction, occurrence or event, and in the regular course of business has caused any or all of the same to be recorded, copied or reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic, or other process which accurately reproduces or forms a durable medium for so reproducing the original, . . . [s]uch reproduction, when satisfactorily identified, shall, in the discretion of the court . . . be as admissible in evidence as the original itself in any judicial . . . proceeding . . . .'' The photostatic reproductions in question were properly authenticated in accordance with this section by employees of the bank. We perceive no abuse of discretion in admitting the evidence.

17. In his forty-sixth assignment Monahan asserts that there was error in admitting against him a conversation be-

tween a witness and Carp which took place on October 14, 1960, in the presence of Monahan. The subject of the conversation was in substance that a change had been made in the location of certain columns of the underground garage on September 20, 1960. An invoice from Kiernan, which was approved by Monahan, was dated May 12, 1960, and recited "changes on structure in regards to columns." The Commonwealth thus contends that the "testimony was material to show Monahan's knowledge about the progress of the work on the garage. Monahan's knowledge in this respect was important, because most of the bills submitted by Kiernan recited a stage of progress in the work . . . . [A]s a result of this conversation between . . . [the witness] and Carp, Monahan was on notice that at least one bill from Kiernan, for which he had voted approval . . . , contained a false statement." On the other hand, Monahan argues that "there was no evidence . . . to establish that he heard the conversation or was in a position to hear it." However, the evidence that the conversation occurred in Monahan's "presence" supports an inference that he heard the conversation. See *Commonwealth* v. *Simpson*, 300 Mass. 45, 50; *Commonwealth* v. *Moore*, 323 Mass. 70, 76-77; *Commonwealth* v. *Tracy*, ante, 87, 96. There was no error.

18. It is assigned as error (assignments 11 and 12) that the Commonwealth was allowed to read portions of the minutes of the meetings of the Authority out of context. In this connection, Monahan also challenges the denial of his motion for a mistrial. The portions of the minutes which were read referred to the persons present at the meetings and to the votes of the Authority regarding payments to be made to the construction engineer. Monahan contends that "[t]he reading and introduction into evidence of these isolated segments . . . , without reading and introducing the minutes . . . in their entirety . . . tended to create an impression that the Authority had been caused to devote an inordinate amount of official time and activity to the disbursement of funds to the construction engineer."

However, it was apparent from the start that the Commonwealth was introducing "sections" and "portions" of the minutes, and that it did not purport to be reading all that had taken place at the meetings. It was reasonable to expect the jurors to understand this, and if there were any "impression[s]" to the contrary, they would be too attenuated under the circumstances to constitute reversible error. This is not a case of omitting to introduce a portion of a writing which explains or helps to interpret the part which is proved. See *Commonwealth* v. *Keyes,* 11 Gray, 323, 324–325. Cf. *Sullivan* v. *Morse,* 271 Mass. 501, 504. In the circumstances, the judge could conclude that to introduce every portion of the minutes would be a "waste of time and attention by cumbering the trial and the record, in the name of completeness, with passages and statements which have no bearing on the present controversy." McCormick, Evidence, § 56. See *Ross* v. *Nourse,* 330 Mass. 666, 671.

19. Monahan claims error (assignment 22) regarding the admission in evidence of a document entitled "Analysis of Construction In Progress To Date" on the grounds that it "was prepared by a third party, was admitted without a proper foundation, and was not material to the matters involving . . . Monahan." However, it is apparent that the document was identified as part of the Authority's financial statement for a period ending on December 31, 1961; that this financial statement was cited in the Authority's minutes of January 29, 1962, as having been approved by the Authority; and that Monahan was present at the meeting and voted to approve the financial statement. An item in the document in question recites the sum of $346,756 presumably to represent earnings of the construction engineer. The document is relevant to show that Monahan's approval of the sum just mentioned was inconsistent with his approval of the 4½% contract under which the construction engineer would receive a smaller sum. The document thus tends to contradict Monahan's testimony that the 4½% contract was authentic and was, therefore, admissible.

20. Error is claimed (assignment 30) in the introduction through the Authority's accountant of a record of the Authority's disbursements on the ground that the accountant was not the keeper of the Authority's records and that the exhibit contained extraneous notations. Monahan also argues that there was no evidence that the record was made in the regular course of business in accordance with G. L. c. 233, § 78. That the accountant was not the keeper of the Authority's records is not a failure to comply with G. L. c. 233, § 78, and does not affect the admissibility of the document. The statute provides that records shall not be inadmissible because of the hearsay character of the facts therein stated "if the court finds that the entry, writing or record was made in good faith in the regular course of business and before the beginning of the civil or criminal proceeding . . . ." Since there was no evidence to the contrary, the admission of the document "imported a finding that the conditions of admissibility contained in the statute had been satisfied." *Commonwealth* v. *Greenberg,* 339 Mass. 557, 579. *Commonwealth* v. *Devlin,* 335 Mass. 555, 563. *Greenberg* v. *Weisman,* 345 Mass. 700, 703. The "extraneous notations" were the accountant's notations of the date "3/28," and constituted evidence, together with his testimony, that he had examined the minutes of the Authority's meeting of March 28, 1960, during the course of his audit in the summer of 1960. There was no error.

21. Monahan presented a number of requests for instructions, and, by his sixty-seventh assignment, claims error in the judge's refusal to grant several of them. We have examined the requested instructions, and foresee no benefit to our jurisprudence from a detailed discussion of their merits and shortcomings. Some of the proposed instructions were erroneous in law, and the judge was therefore right in refusing to give them. *Commonwealth* v. *Perry,* 254 Mass. 520, 530. Others were based on inaccurate statements of the evidence and were hence properly rejected. However correct the remaining requested instructions might have been, there was no error in refusing

to give them inasmuch as their subject matter was adequately covered in the charge. *Commonwealth* v. *Agiasottelis,* 336 Mass. 12, 15–16. *Commonwealth* v. *Gliniecki,* 339 Mass. 464, 470. ''While a defendant, in a criminal case, is entitled to have the issues of fact clearly presented to the jury and the law applicable thereto carefully explained, the method and extent of the charge must be left to the discretion of the judge. It is not to be expected that he shall discuss every subsidiary fact and possible inference.'' *Commonwealth* v. *Greenberg,* 339 Mass. 557, 584. The judge did not attempt to review the vast amount of evidence adduced, but did give generally accurate and complete instructions.

22. By assignment 66 Monahan challenges the ''propriety'' of the instruction that it is a ''question of fact'' for the jury ''to decide whether the relationship between . . . [First National] and the Authority is governed by'' ''the resolution appointing . . . First National . . . as Construction Fund Trustee and the document commonly referred to as the Statement which incorporates language spelling out the duties, rights and privileges and obligations of the Construction Fund Trustee.'' We need not decide whether this instruction was error since the bond resolution as a matter of law governs the relationship between the Authority and First National. See the terms of the resolution, *supra,* and St. 1958, c. 606, §§ 8 and 9. The instruction could only have benefited Monahan. If the jury had incorrectly determined the law they might have exonerated him. In no sense could this instruction have been prejudicial.

23. Regarding the sixty-fourth assignment of error, we see no arguable basis for Monahan's motions to compel the Commonwealth to elect its theory of the manner in which the alleged larceny was committed, and to strike all evidence relating to fraudulent contracts with the Authority. It is not argued that Monahan was prejudiced by the denial of these motions, and we discern no such prejudice. There was no error.

24. Finally,[11] Monahan argues in his brief that, "in passing upon the question of whether or not an error constitutes mere harmless error, the court should take into consideration the combined effect of such errors on the defendant's constitutional right . . . ." In support of this argument Monahan invokes the rationale of *Wolcher* v. *United States*, 200 F. 2d 493, 499 (9th Cir.). In our review of the entire voluminous transcript of evidence, we have been unable to discover any violation of Monahan's constitutional rights.

25. The judgments against each defendant are affirmed.

*So ordered.*

---

[11] Monahan filed sixty-nine assignments of error. We have considered all assignments which have been argued. The others are deemed waived. Several assignments have been mentioned in Monahan's brief but can scarcely be regarded as argued and are, therefore, also deemed waived. *Commonwealth* v. *Griffin*, 345 Mass. 283, 284.